IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| CARLSON ENVIRONMENTAL CONSULTANTS, PC, <br><br> Plaintiff, <br><br> v. <br><br> SEAN SLAYTON, <br><br> Defendant. | Civil Action No.: 3:17-cv-149 <br><br> **COMPLAINT** |

Plaintiff CARLSON ENVIRONMENTAL CONSULTANTS, PC ("CEC"), hereby brings this action against Defendant SEAN SLAYTON ("Slayton"), and alleges as follows:

### I. NATURE OF THE ACTION

This is a Complaint for injunctive relief and compensatory damages against the Defendant Sean Slayton for breach of his contractual obligations to Plaintiff Carlson Environmental Consultants, PC and tortious interference with existing and prospective customer relations. Plaintiff also seeks specific performance of Slayton's contractual obligations and related damages.

### II. PARTIES, JURISDICTION AND VENUE

2. CEC is a North Carolina professional corporation with its principal place of business in Monroe, Union County, North Carolina.

3. Sean Slayton is, upon information and belief, a citizen and resident of Madison County, Illinois. Sean Slayton is a former employee of CEC.

4. This Court has personal jurisdiction over the parties and subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332, by virtue of the fact that the Plaintiff and Defendant are citizens of different states such that there is complete diversity of citizenship, and the amount in controversy exceeds $75,000. The Defendant is subject to the personal jurisdiction of the Court pursuant to North Carolina's long arm statute, N.C. Gen. Stat. § 1-75.4.

5. Venue is proper in this Court as Plaintiff's principal office is located within the Western District of North Carolina.

### III. BACKGROUND FACTS

6. Plaintiff hereby realleges the allegations of paragraphs 1 through 6 as if fully set forth herein.

7. CEC was founded in 2004, and provides specialty engineering, operations and maintenance, and construction services to the solid waste industry across the United States. One of CEC's unique services is landfill gas construction, which consists of both well drilling and pipeline construction and installation. Kristofer Carlson, P.E. is CEC's President and Seth Nunes, P.E. is a Vice President, and both were directly involved in the matters set forth herein.

8. CEC has offices in Monroe, North Carolina; Richmond, Virginia; Olympia, Washington; Cookeville, Tennessee; Marietta, Georgia; and Jupiter, Florida. From these office locations, CEC performs its services across the United States.

9. One of the key services CEC provides is landfill gas well drilling, which is a highly specialized and complex service involving the use of special drilling equipment to drill holes in landfills and to then construct wells and related pipelines designed to extract the methane gas resulting from the natural decomposition of the landfill's contents. Once the drilling is complete, a gas collection system is installed and the resulting gas is used for power

generation. Due to the complexity and specialization required to perform landfill gas pipeline and drilling services, CEC has focused almost entirely on these segments of the solid waste market to grow CEC's business.

10. CEC works on landfill gas well drilling projects throughout the United States for a number of companies. CEC's two most important clients for which it has provided landfill gas well drilling services are Waste Management, Inc. and Republic Waste Services, Inc., both of which are national providers of landfill disposal services and own/operate landfills across the United States. Due to its long association with these clients, CEC is extremely familiar with their construction requirements, safety requirements, their project operations and personnel, and other expectations on these projects.

11. Landmarc Environmental Systems ("Landmarc"), based in Naperville, Illinois, is one of CEC's primary competitors in the landfill gas construction business. CEC and Landmarc have submitted competing bids on landfill gas projects throughout Texas, Michigan, Ohio, Arkansas, Tennessee, Kentucky and most recently on a National Drilling Services Price Proposal for Waste Management, Inc. in all states East of the Grand Canyon.

12. Prior to November 19, 2015, Sean Slayton was a key principal and driller of Quality Drilling Services, LLP ("QDS"), an Ohio limited liability partnership providing landfill gas well drilling services  CEC and QDS frequently served as subcontractors on the same landfill gas well drilling projects, with CEC serving as the prime contractor and QDS performing the well drilling. CEC had provided landfill gas construction services (pipeline installation and drilling) on projects in multiple states. CEC's competitors also frequently hired QDS for landfill gas well drilling on projects that CEC had bid on.

3

13. In the summer of 2015, CEC concluded that it would be beneficial for CEC to become more competitive in the landfill gas well drilling industry. CEC decided that in order to do so, it would need to increase its drilling capabilities by owning all necessary landfill gas well drilling equipment, gain more control over the project schedules to insure timely completion and recurring business, and have its own crews instead of subcontracting the drilling services to third parties. One of the other objectives of this plan was to limit CEC's competitors' ability to effectively compete on these projects by having QDS work exclusively through CEC. CEC's principals believed that this plan would put it in a position to obtain more business from Republic Waste Services, Waste Management and other companies putting these projects out for bid.

14. In June 2015, CEC Vice President Seth Nunes met with Susie Slayton, an owner of QDS, and her husband Sean Slayton to discuss a potential business deal. The other owner of QDS, Mari Slayton, is Sean Slayton's mother, but she did not attend this meeting. Sean Slayton is Susie Slayton's husband and Mari Slayton's son. In these discussions, Nunes made clear that Mari Slayton, Sean and Susie Slayton, and their son Austin, who also worked for QDS, would be required to sign two-year non-compete agreements as a condition of any consummated transaction.

15. On July 22, 2015, CEC and QDS entered into a Letter of Intent ("LOI") pursuant to which CEC would purchase the assets of QDS. One of the key assets CEC would purchase through the transaction was a particular drill rig known as AF130, NXP1244, 2159.

16. Sean Slayton was a key employee of QDS, and CEC's employment of Sean Slayton was an integral part of the transaction described in the LOI. Accordingly, the LOI expressly stated that CEC would enter into an employment agreement with Sean Slayton

pursuant to which he would be an employee-at-will and subject to confidentiality and noncompetition provisions. As set forth in Paragraph 5(e) of the LOI, Sean Slayton's execution of the foregoing employment agreement was stated as a condition to CEC"s closing.

17. On or about the same time as the LOI, CEC entered into a "Short Term Employment Agreement" with Sean Slayton. The Short Term Employment Agreement was intended to remain in effect until the closing of the purchase transaction described in the LOI.

18. Pursuant to the Short Term Employment Agreement, CEC hired Sean Slayton as its Drilling Manager, and Slayton agreed as follows:

> Employee acknowledges that Employee has a duty of loyalty to Company and shall not, during the Term, engage in, directly or indirectly, any other business or activity whether or not for pecuniary gain, which could adversely affect Company's business or Employee's ability to perform Employee's duties under this Agreement

19. On November 19, 2015, CEC purchased the assets of QDS as memorialized in an Asset Purchase Agreement of the same date. As a specific term and condition of the foregoing transaction and as a requirement to his becoming an at-will employee of CEC, Sean Slayton was required to enter into a Confidentiality and Noncompetition Agreement with CEC. Slayton's Confidentiality and Noncompetition Agreement contained several material terms implicated here, specifically, a confidential information non-disclosure provision, a covenant not to compete and an employee non-solicitation provision. A copy of Sean Slayton's executed Confidentiality and Noncompetition Agreement is attached hereto as **Exhibit 1**.

20. Section 3 of Slayton's Confidentiality and Noncompetition Agreement contains a Confidential Information non-disclosure provision in which Slayton agrees that CEC provides specialty engineering, operations and maintenance and construction services to the solid waste industry which is highly competitive and involves the use of trade secrets and other proprietary

5

information of CEC. Slayton agreed further that if such trade secrets or information were disclosed to a competing business or otherwise used in an unauthorized manner, or if Slayton accepted employment with a competing business in violation of this Agreement, such disclosure, use or employment would cause immediate and irreparable harm to CEC and would give a competing business an unfair advantage against CEC, and therefore CEC had a legitimate interest in protecting such information from unauthorized possession, use or disclosure, and to protect itself from unfair competition.

21. Slayton agreed that the following information constitutes CEC's Confidential Information: information concerning the Employer's discoveries, ideas, conceptions, formulas, mask works, licensed technologies and software, information, innovations, inventions, methods, processes, apparatuses, devices, products, techniques, technologies, and improvements thereto and physical manifestation thereof; information concerning the nature of Employer's business and its manner of operation, financial and accounting information, such as cost, pricing and billing information, customer profiles, financial policies and procedures, revenues and profit margins; sales and marketing information, such as sales strategies and programs, and information concerning Employer's customers and customer lists; company policies and procedures; information concerning Employer's business relationships with persons, firms, corporations and other entities; and other internal business information of Employer. Confidential Information also includes QDS's confidential information and trade secrets which were purchased as assets by CEC.

22. Slayton agreed that such Confidential Information is a valuable and unique asset of CEC, and that he will not at any time or in any manner, directly or indirectly, divulge, disclose or communicate any such Confidential Information to any person, firm, corporation or other

6

entity for any reason without the prior express, written consent of CEC unless such information: (i) is in the public domain through no wrongful act of Slayton; (ii) has been rightfully received from a third party without restriction and without breach of this Agreement; or (iii) except as may be required by law.

23. Section 4.c. of Slayton's Confidentiality and Noncompetition Agreement contains the noncompetition covenant and provides that during the Restricted Period of two (2) years following his separation from employment with CEC, within the Restricted Territory, Slayton shall not do the following:

> (1) Employee shall not develop, market, solicit, sell, or otherwise provide or perform services identical to those services that Employee developed, marketed, solicited, sold, provided or performed while employed with Employer; [or]
>
> (2) Employee shall not become employed by (as an officer, director, employee, consultant or otherwise), or otherwise become commercially interested in or affiliated with (whether through direct, indirect, actual or beneficial ownership or through a financial interest), a Competitor, unless Employee accepts employment with a Competitor in an area of the Competitor's business which does not compete with the Employer.

24. The "Restricted Territory" governing the noncompetition provision is defined in Section 4.d. as follows:

> In recognition of the nationwide basis of the Employer's Business, Employee's involvement on a nationwide basis in the core activities of Employer's Business and the ease of competing with that Business in any part of the United States, for the purposes of this Agreement, the "**Restricted Territory**" shall be defined as the United States. In the alternative, and only if the aforementioned territory is deemed by a court of competent jurisdiction to be unreasonable or otherwise invalid or unenforceable, then the Restricted Territory shall be defined as the states of Florida, Georgia, Illinois, North Carolina, Ohio, South Carolina, Tennessee and Virginia. In the alternative, and only if the aforementioned territory is deemed by a court of competent jurisdiction to be unreasonable or otherwise invalid or unenforceable, then the Restricted Territory shall be defined as the states of Illinois, North Carolina and Ohio. In the alternative, and only if the aforementioned territory is deemed by a court of competent jurisdiction to be

7

unreasonable or otherwise invalid or unenforceable, then the Restricted Territory shall be defined as the state of North Carolina.

25. In Section 4.e of the Confidentiality and Noncompetition Agreement, Slayton also agreed not to solicit CEC employees during the Restricted Period as follows:

> Employee further agrees that during the Restricted Period and within the Restricted Territory, he shall not hire, employ, solicit or attempt to solicit or induce any person employed with Employer, or solicit or induce any supplier or other contractor of Employer, to leave such employment, or to end or reduce any business relationship with Employer, or to violate any covenant not to compete, non-solicitation agreement, confidentiality agreement, nondisclosure agreement or any other restrictive covenant, employment agreement, independent contractor agreement or other business relationship with Employer.

26. In Section 5 of the Confidentiality and Noncompetition Agreement, Slayton agreed not to solicit or attempt to solicit, the business of any of CEC's Customers to whom Slayton has sold any QDS or CEC products or services while employed by QDS or CEC, regardless of where such Customer is located. In the Agreement, "Customer" is defined to mean any Person that has purchased Quality's or CEC's products or services during the twelve (12) months immediately before the Restricted Period.

27. Slayton also agreed that CEC would be "entitled as a matter of right to injunctive relief" upon any breach or threatened breach of Slayton's obligations in the Confidentiality and Noncompetition Agreement.

28. Slayton also agreed in Section 11 of his Confidentiality and Noncompetition Agreement that "Any period of violation of this Agreement which results in legal action to enforce same shall toll the period of time in which Employee shall be restricted hereunder, so that such Restricted Period shall begin and be in full force and effect from the date of such enforcement."

29. From the execution of the Short Term Employment Agreement in July 2015 through his termination on December 14, 2016, Sean Slayton performed drilling services exclusively for CEC all over the United States, including in the states of Texas, Pennsylvania, Kentucky, Kansas, North Carolina, South Carolina, Texas, Arizona, Massachusetts, Tennessee, Missouri, Indiana, Florida, Georgia, Minnesota, Michigan, Virginia, Ohio, Alabama, Arkansas, Oklahoma, Puerto Rico, West Virginia, and Colorado.

30. In 2016 and 2017, CEC bid on landfill gas well drilling projects across the United States, from the Pacific Northwest, to Texas, to New England and all areas in between. In 2015 and 2016, CEC provided landfill gas construction services in 39 states ranging from Maine to New Mexico.

31. In 2016, Landmarc and CEC entered into an agreement pursuant to which CEC would lease, and then ultimately purchase, a drill from Landmarc in exchange for Landmarc's agreement to hire CEC for as many drilling jobs as CEC had the resources to handle. At that time, it was expected that Landmarc had sufficient new and recurring business over the next 2 to 3 years to provide CEC with a substantial amount of drilling work.

32. In March 2016, CEC entered into a 60-day lease agreement with Landmarc to lease one of Landmarc's landfill gas well drill rigs. At the end of the lease term, CEC had the option to purchase the subject drill rig. Landmarc informed CEC's principals that this lease-purchase arrangement was part of its overall strategy to get out of the landfill gas well drilling business.

33. During 2016, Landmarc and CEC bid on many of the same landfill gas well drilling projects throughout Texas, Michigan, Ohio, Arkansas, Tennessee, Kentucky, and Alabama.

34. On December 14, 2016, CEC terminated the employment of Sean Slayton due to job-related misconduct and failure to operate CEC's drilling business in an acceptable manner. A copy of the termination letter is attached hereto as **Exhibit 2**.

35. Since termination of his employment with CEC, Slayton has failed and refused to abide by the provisions of his November 2015 Confidentiality and Noncompetition Agreement.

36. Upon information and belief, since January 2017, Slayton has provided landfill gas well drilling services to CEC customers as an employee of CEC Competitor Landmarc at the Pinehill Landfill in Kilgore, Texas.

37. Upon information and belief, Slayton has provided landfill gas well drilling services to CEC's competitor Landmarc at other landfills in Texas and other states.

38. Slayton has also solicited landfill gas well drilling business from CEC customers Landmarc and SCS Field Services based in Reston, Virginia, and Enerdyne Power Systems, Inc. based in Charlotte, North Carolina.

39. Since the commencement of Slayton's employment with Landmarc, Landmarc has ceased doing business with CEC.

40. On January 27, 2017 CEC, through counsel, sent Slayton a cease and desist letter, reminding Slayton of his obligations to CEC under the Confidentiality and Noncompetition Agreement, a copy of which was enclosed with the letter. In the letter, Slayton was informed that his employment with Landmarc violated his Agreement. A copy of the foregoing letter is attached hereto and incorporated by reference as **Exhibit 3**.

41. To date, Slayton has failed and refused to abide by the provisions of his Confidentiality and Noncompetition Agreement, and continues to be employed by Landmarc and

10

to perform and provide the identical services he provided to CEC in competition with CEC within the Restricted Territory.

## FIRST CAUSE OF ACTION
**Breach of Contract – Violation of Noncompetition Covenant**

42. The allegations of Paragraphs 1 through 41 are hereby reallaged and incorporated by reference as if fully set forth herein.

43. The Confidentiality and Noncompetition Agreement entered into between Slayton and CEC is a valid and binding contractual agreement.

44. Slayton's employment with Landmarc, a competitor of CEC, constitutes a breach and violation of the covenant not to compete contained in the Confidentiality and Noncompetition Agreement, because Slayton is employed by a Competitor (as defined in the Agreement) and is providing and performing the identical services he provided and performed as an employee of CEC within the two-year Restricted Period within the Restricted Territory.

45. To the extent that Slayton is providing or performing services identical to those provided or performed while employed by CEC, independent of any employment or affiliation with Landmarc, this also constitutes a breach of the covenant not to compete.

46. By engaging in the foregoing conduct, Slayton has materially breached, is breaching and, unless enjoined, will continue to breach the covenant not to compete in his Confidentiality and Noncompetition Agreement with CEC.

47. Slayton's material breach of his contractual obligations has caused and will continue to cause immediate and irreparable harm to CEC, and CEC's contractual rights must be protected.

48. In Section 6.b of his Confidentiality and Noncompetition Agreement, Slayton agreed to the entry of an injunction against him should he violate the covenant not to compete or confidentiality provisions thereof.

49. Plaintiff is entitled to preliminary and injunctive relief against Slayton as a result of the contractual violation set forth above.

50. Further, upon information and belief, as a consequence of Slayton's violation of the Confidentiality and Non-Competition Agreement as set forth above, CEC has been and continues to suffer financial damages and will continue to suffer financial damages.

51. Plaintiff is entitled to damages from Slayton for the violations alleged herein and other violations that may be identified through discovery.

## SECOND CAUSE OF ACTION
### Breach of Contract – Violation of Employee Non-Solicitation Provision

52. The allegations of Paragraphs 1 through 51 above are hereby realleged and incorporated by reference as if fully set forth herein.

53. Slayton's actions in soliciting CEC employees for employment with Landmarc during the Restricted Period and within the Restricted Territory as set forth above constitutes a material breach of the employee non-solicitation provision in Section 4.e of his Confidentiality and Non-Competition Agreement.

54. Plaintiff is entitled to preliminary and injunctive relief against Slayton as a result of the contractual violation set forth above.

55. Further, upon information and belief, as a consequence of Slayton's violation of the Confidentiality and Non-Competition Agreement as set forth above, CEC has been and continues to suffer financial damages and will continue to suffer financial damages.

56. Plaintiff is entitled to damages from Slayton for the violations alleged herein and other violations that may be identified through discovery.

## THIRD CAUSE OF ACTION
### Breach of Contract – Violation of Customer Non-Solicitation Provision

57. The allegations of Paragraphs 1 through 56 are hereby reallaged and incorporated by reference as if fully set forth herein.

58. Slayton's Confidentiality and Noncompetition Agreement specifically prohibits him from soliciting or attempting to solicit the business of any of CEC's Customers (as defined in therein) to whom Slayton sold any QDS or CEC products or services while employed by CEC.

59. Upon information and belief, Slayton has solicited and continues to solicit CEC Customers for business on behalf of himself or his new employer, Landmarc.

60. Slayton's solicitation of CEC Customers as described above constitutes a breach of his Confidentiality and Noncompetition Agreement.

61. Plaintiff is entitled to preliminary and injunctive relief against Slayton as a result of the contractual violation set forth above.

62. Further, upon information and belief, as a consequence of Slayton's violation of the Confidentiality and Non-Competition Agreement as set forth above, CEC has been and continues to suffer financial damages and will continue to suffer financial damages.

63. Plaintiff is entitled to damages from Slayton for the violations alleged herein and other violations that may be identified through discovery.

## FOURTH CAUSE OF ACTION
### Specific Performance of Slayton's Contractual Obligations

64. The allegations of Paragraphs 1 through 63 are hereby reallaged and incorporated by reference as if fully set forth herein.

65. As more particularly set out above, Slayton has violated, and is continuing to violate, the restrictive covenants contained in his Confidentiality and Noncompetition Agreement.

66. As a consequence of the foregoing, CEC has suffered and will continue to suffer substantial irreparable harm and needs protection of its contractual rights.

67. In Section 6.b of his Confidentiality and Noncompetition Agreement, Slayton agreed to the entry of an injunction against him should he violate the covenant not to compete or confidentiality provisions thereof.

68. CEC is entitled to an order and judgment from the Court requiring specific performance of Slayton's contractual obligations to CEC under the Confidentiality and Noncompetition Agreement.

### FIFTH CAUSE OF ACTION
**Tortious Interference with Existing and Prospective Business Relations**

69. The allegations of paragraphs 1 through 68 are hereby realleged and incorporated by reference as if fully set forth herein.

70. Since its founding in 2004, CEC has established a number of stable and important customer relationships. Recurring business from these customers is a critical component to CEC's future success.

71. CEC aggressively protects its customer relationships and has made its employees and competitors aware of this practice.

72. Slayton is aware of the foregoing customer relationships by virtue of his employment with CEC.

73. Upon information and belief, Slayton has made false and disparaging remarks regarding CEC and its ability to provide landfill well gas drilling services in order to

14

intentionally harm CEC's customer relationships and to gain an unfair competitive advantage over CEC.

74. Slayton's conduct as described above has damaged and interfered with CEC's customer relationships and has potentially impaired CEC's ability to continue conducting business with these customers in the future.

75. Slayton's conduct in tortiously interfering with CEC's existing and prospective customer relationships was conducted for a wrongful purpose, without justification and continues to be willful, malicious, and in complete disregard of CEC's interests in maintaining those customer relationships.

76. As a direct and proximate result of Slayton's tortious interference with CEC's customer relationships, CEC has suffered damages and will continue to suffer damages.

77. Plaintiff is entitled to damages from Slayton for the violations alleged herein and other violations that may be identified through discovery.

**SIXTH CAUSE OF ACTION**
**Unfair and Deceptive Trade Practices**
**(N.C. Gen. Stat. § 75-1.1 *et. seq.*)**

78. The allegations of Paragraphs 1 through 77 are hereby realleged and incorporated by reference as if fully set forth herein.

79. Defendant's actions described above which constitute tortious interference with existing and prospective business relations were in and affecting commerce as defined by N.C. Gen. Stat. § 75-1.1 *et seq.*

80. Defendant's actions as set forth above constitute unfair methods of competition and unfair or deceptive trade practices in and affecting commerce in violation of N.C. Gen. Stat. § 75-1.1 *et seq.*

15

81. As a direct and proximate result of Defendant's unfair and/or deceptive methods, acts or practices, CEC has been damaged in an amount to be established at trial is entitled to the relief set forth below.

82. CEC is also entitled to an award of treble damages pursuant to N.C. Gen. Stat. § 75-16 for damages sustained as a result of Defendants' unfair and deceptive conduct.

83. CEC is also entitled to an award of its reasonable attorney's fees pursuant to N.C. Gen. Stat. § 75-16.1.

WHEREFORE, CEC prays for the following relief:

1. For a Preliminary Injunction and Permanent Injunction enjoining Defendant Sean Slayton, and all others acting in concert therewith, from violating the terms of the Confidentiality and Noncompetition Agreement, including all restrictive covenants, and more specifically from providing or performing services identical to those provided while employed by CEC either on his own behalf or as an employee or affiliated with a Competitor within the Restricted Territory within the Restricted Period.

2. For a Preliminary Injunction and Permanent Injunction enjoining Defendant Sean Slayton, and all others acting in concert therewith, from directly or indirectly, divulging, disclosing or communicating any CEC Confidential Information.

3. For a Preliminary Injunction and Permanent Injunction enjoining Defendant Sean Slayton, and all others acting in concert therewith, from soliciting or attempting to solicit, the business of any of CEC's Customers to whom Employee has sold any QDS or CEC products or services while employed by QDS or CEC, regardless of where such customer is located.

16

4. For a Preliminary Injunction and Permanent Injunction enjoining Defendant Sean Slayton, and all others acting in concert therewith, from hiring, employing soliciting or attempting to solicit or induce any person employed with CEC.

5. That the above-requested Preliminary Injunction be issued for the period of time until trial of this action or until the end of the two year Restricted Period, whichever comes first, unless such time is modified by subsequent order of the Court; and that the above-requested permanent injunction be issued for the period of time, if any, remaining between the conclusion of the trial of this action and the end of two years from Defendant Slayton's breach of his non-competition covenant.

6. For an order and judgment requiring specific performance of Defendnat Slayton's contractual obligations to Plaintiff CEC under Sections 3, 4 and 5 of the Confidentiality and Noncompetition Agreement.

7. An accounting of any gain received, directly or indirectly, by Defendant Slayton by virtue of wrongful acts as described herein;

8. For actual damages, in an amount to be established at trial, in excess of $75,000.

9. For prejudgment interest and post-judgment interest on any award of damages at the highest rate permitted by contract or applicable law.

10. That the costs of this action be taxed against Defendant Slayton.

11. That the Plaintiff have and recover from the Defendant its reasonable attorneys' fees as authorized pursuant to applicable law;

12. That this matter be tried before a jury; and

13. For such further relief that this Court deems just and proper.

This 21st day of March, 2017.

>*/s/ G. Bryan Adams III*
>G. Bryan Adams, III
>N.C. Bar No. 17307
>VAN HOY, REUTLINGER, ADAMS & DUNN, PLLC
>737 East Boulevard
>Charlotte, North Carolina 28203
>Telephone: (704) 375-6022
>Fax: (704) 375-6024
>Email: bryan.adams@vradlaw.com
>
>**ATTORNEYS FOR PLAINTIFF CARLSON ENVIRONMENTAL CONSULTANTS, PC**