IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| CARLSON ENVIRONMENTAL CONSULTANTS, PC, | ) | Civil Action No.: 3:17-cv-149 |
| Plaintiff, | ) | |
| v. | ) | |
| SEAN SLAYTON, | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## I. INTRODUCTION

The Defendant has breached and continues to breach the noncompetition provisions in his employment agreement with Carlson Environmental Services, PC ("CEC"). CEC's vital customer relationships, goodwill and its ability to obtain landfill gas well drilling projects in the future are being damaged and jeopardized by the Defendant's actions in ways that cannot readily be measured, which are devastating to CEC's business. The Defendant, on the other hand, cannot be harmed by being required to do what he already agreed to do – not compete against CEC by performing the same services he performed for CEC for a period of two years within the Restricted Territory defined in his noncompetition agreement. The Defendant's actions demonstrate his utter disregard for the contractual promises he made to CEC and he and his employer have no

intention of having Defendant comply with his noncompetition agreement. CEC will be irreparably harmed in the absence of an injunction, which CEC believes is the only way to obtain Defendant's compliance with this agreement.

## II.    STATEMENT OF THE FACTS

CEC was founded in 2004, and provides specialty engineering, operations and maintenance, and construction services to the solid waste industry across the United States. One of CEC's unique services is landfill gas construction, which consists of both well drilling and pipeline construction and installation.   Kristofer Carlson is CEC's President, Seth Nunes is CEC's Vice President, Brent Ross is a Project Director and Thomas Lafollette is a Landfill Gas Pipeline Supervisor. Each has submitted an affidavit in support of this Motion. Carlson Aff., ¶¶ 2-3.

One of the key services CEC provides is landfill gas well drilling, which is a highly specialized and complex service involving the use of special drilling equipment to drill holes in landfills and to then construct wells and related pipelines designed to extract the methane gas resulting from the natural decomposition of the landfill's contents. CEC has focused almost entirely on these segments of the solid waste market to grow its business. *Id.* at ¶ 4.

CEC works on landfill gas well drilling projects throughout the United States for a number of companies. CEC's two most important clients for which it has provided landfill gas well drilling services are Waste Management, Inc. and Republic Waste Services, Inc., which are national owners/operators of landfills across the United States. Due to its long association with these clients, CEC is extremely familiar with their construction requirements, safety requirements, their project operations and personnel, and other expectations on these projects. *Id.* at ¶ 5; *See* Nunes Aff., ¶3.

Landmarc Environmental Systems ("Landmarc") is one of CEC's primary competitors in the landfill gas construction business. CEC and Landmarc have submitted competing bids on landfill gas projects across the United States. On a number of recent projects in 2017, CEC has lost business to Landmarc. *Id.* at ¶ 6; *See* Nunes Aff. at ¶¶ 4-6.

Prior to November 19, 2015, Defendant Sean Slayton ("Slayton") was a key principal and driller of Quality Drilling Services, LLP ("QDS"), which provided landfill gas well drilling services. CEC and QDS frequently served as contractors on the same landfill gas well drilling projects, with CEC serving as the prime contractor and QDS performing the well drilling as a subcontractor. CEC purchased its own drilling equipment in May 2014. CEC had provided landfill gas construction services (pipeline installation and drilling) on projects in multiple states. CEC's competitors also frequently hired QDS for landfill gas well drilling on projects that CEC had bid on. Carlson Aff., ¶ 7.

In the summer of 2015, with the volume of drilling work exceeding the capacity of CEC's existing drill rig and CEC utilizing drilling subcontractors such as QDS on a frequent basis, CEC concluded that it needed to become more competitive. CEC decided to increase its drilling capabilities by purchasing the assets of QDS, which included a drill rig and related tools, client contacts, client information, goodwill, bidding information, and other proprietary data. One of the other objectives of this plan was to limit CEC's competitors' ability to effectively compete on these projects by having QDS work exclusively through CEC. CEC's principals believed that this plan would put it in a position to obtain more business from Republic Waste Services, Waste Management and other companies putting these projects out for bid. *Id.* at ¶ 8.

On November 19, 2015, CEC purchased the assets of QDS. Slayton was required to enter into a Confidentiality and Noncompetition Agreement ("CEC Agreement") with CEC as a

specific term and condition of the foregoing transaction and as a requirement to his becoming a CEC employee. Slayton's CEC Agreement contained a confidential information non-disclosure provision, a covenant not to compete, non-solicitation provisions applicable to customers, employees and suppliers. *Id.* at ¶¶ 9-18 and Exh 1 (CEC Agreement).

CEC required Slayton to sign the CEC Agreement to protect its valuable client relationships, goodwill and CEC's confidential information to which Slayton would have access by virtue of his position at CEC. Since 2004, CEC has expended substantial resources developing its business relationships, in establishing goodwill and obtaining a national reputation as a provider of landfill gas well drilling services. CEC is an expert in its field and has developed pricing and bidding processes which give it a competitive advantage in the industry. Slayton acknowledged the above when he signed his CEC Agreement and thereafter took advantage of his access to CEC's confidential information which he gained access to only after signing the CEC Agreement. *Id.* at ¶ 10.

A critical, and fundamental, provision of Slayton's CEC Agreement is the covenant not to compete which provides that during the Restricted Period of two (2) years following his separation from employment with CEC, within the Restricted Territory, Slayton shall not do the following:

> (1) Employee shall not develop, market, solicit, sell, or otherwise provide or perform services identical to those services that Employee developed, marketed, solicited, sold, provided or performed while employed with Employer; [or]
>
> (2) Employee shall not become employed by (as an officer, director, employee, consultant or otherwise), or otherwise become commercially interested in or affiliated with (whether through direct, indirect, actual or beneficial ownership or through a financial interest), a Competitor, unless Employee accepts employment with a Competitor in an area of the Competitor's business which does not compete with the Employer.

Carlson Aff., at ¶ 14, and Exh. 1, Sec. 4.c.

In recognition of the nationwide basis of CEC's business and Slayton's involvement on a nationwide basis in the core activities of CEC's Business and the ease of competing with that Business in any part of the United States, the Agreement's Restricted Territory is defined as the United States. The territorial restriction also includes a number of successively smaller areas in which Slayton's competition against CEC is prohibited in the event that a court deems the nationwide territory to be unreasonable or otherwise invalid or unenforceable. *Id.* at ¶ 15.

Slayton also agreed not to solicit CEC employees or suppliers for a two-year period following cessation of his employment. *Id.* at ¶¶ 16-17 and Exh.1, Secs. 4.e, 5.

Throughout his CEC employment, Slayton served as a Drilling Superintendent/Supervisor. Slayton was the client contact for multiple CEC clients, and was the point of contact when he was in the field at any landfill facility. Slayton managed 3 CEC drillers and up to 12 employees. Slayton was directly involved in CEC's pricing process and in formulating and submitting CEC's drilling proposals and bids. Accordingly, Slayton had access to highly confidential pricing information and knew CEC's unique and proprietary method of creating proposals and bids, which provides CEC with a competitive advantage over its competitors like Landmarc. Slayton was in charge of hiring and drill crew set-up and had direct knowledge of employee salaries and bonuses at CEC, thus making his employee non-solicitation provision particularly important, because he possessed information that could enable him to lure employees away were he to join a competitor. Carlson Aff., ¶ 20.

Slayton was also a CEC client liaison, which enabled him to have personal contact and develop relationships with CEC's existing and potential clients and to learn valuable insight regarding their business opportunities, needs and requirements and the key contacts within each. The nature of Slayton's position and his supervision of drillers and other CEC employees

provided him with high-level knowledge about CEC's operations which gave CEC a competitive edge against its competitors. *Id.* at ¶ 21.

Slayton performed drilling services exclusively for CEC all over the United States, including in the states of Texas, Pennsylvania, Kentucky, Kansas, North Carolina, South Carolina, Texas, Arizona, Massachusetts, Tennessee, Missouri, Indiana, Florida, Georgia, Minnesota, Michigan, Virginia, Ohio, Alabama, Arkansas, Oklahoma, Puerto Rico, West Virginia, and Colorado. *Id.* at ¶ 22.

In 2016 and 2017, CEC bid on landfill gas well drilling projects across the United States, from the Pacific Northwest, to Texas, to New England and all areas in between. In 2015 and 2016, CEC provided landfill gas construction services in 39 states ranging from Maine to Colorado. Prior to his termination on December 14, 2016, Slayton was directly involved in preparing the bids for these projects using his knowledge of CEC's Confidential Information, including pricing and its bid formulation method. *Id.* at ¶¶ 23, 26.

In 2016, CEC entered into an agreement with Landmarc to lease and then purchase a drill in exchange for Landmarc's agreement to hire CEC for as many drilling jobs as CEC had the resources to handle. I t was expected that Landmarc had sufficient new and recurring business over the next 2 to 3 years to provide CEC with a substantial amount of drilling work. *Id.* at ¶ 24. Landmarc informed CEC's principals that this lease-purchase arrangement was part of its overall strategy to get out of the landfill gas well drilling business. *Id.* at ¶ 25.

On December 14, 2016, CEC terminated Slayton's employment due to job-related misconduct and failure to operate CEC's drilling business in an acceptable manner. Carlson Aff., ¶ 27 and Exh. 2 (termination letter).

On January 27, 2017, CEC sent Slayon and Landmarc a cease and desist letter upon learning he was employed by Landmarc and enclosed a copy of Slayton's CEC Agreement. *Id.* at ¶ 32; *See* Complaint, Exh. 3 (letter).

On March 22, 2017, CEC filed this lawsuit because Slayton continued to be employed with Landmarc performing the same services he had performed for CEC within the Restricted Territory. *Id.* at ¶ 33.

On April 17, 2017, Slayton brought a Motion to Dismiss, contending that Slayton's Confidentiality and Noncompetition Agreement was overly broad and unenforceable. On May 9, 2017, CEC filed its Response in Opposition to Slayton's motion. The Court denied Slayton's Motion to Dismiss on May 11, 2017.

Following this ruling, CEC was hopeful that Slayton would begin to comply with his CEC Agreement and cease and desist from his activities in violation thereof. Carlson Aff., ¶ 35.

While Slayton's motion to dismiss was pending, CEC engaged a private investigator in Kentucky to determine the scope of Slayton's activities. The investigator was able to confirm that Slayton entered a Landmarc vehicle, departed the scene and arrived at a landfill where Landmarc was working on a project, but was unable to provide confirmation of Slayton performing landfill gas well drilling services. *Id.* at ¶ 36; *See* Declaration of Richard Travelstead (private investigator).

In late June, 2017, CEC learned, through its Project Director and employee Brent Ross, that Sean Slayton was involved in managing and providing technical support on projects within the Restricted Territory. In late June 2017, Ross was serving as a Construction Quality Assurance ("CQA")/Engineer at the Hickory Hill landfill in Ridgeland, South Carolina where Landmarc was performing landfill gas well drilling. Former CEC employee and Slayton

subordinate Josh Goosman ("Goosman") was operating the drill rig for Landmarc and ran into a problem. Goosman made a phone call and then reported to Brent Ross that he had called Sean Slayton to get his advice on how to resolve the issue. Carlson Aff., ¶ 17; *See* Affidavit of Brent Ross.

In mid-July, 2017, CEC's Landfill Gas Pipeline Supervisor Thomas Lafollette told CEC that, in early June, 2017 while Lafollette was a Landmarc employee, he observed Sean Slayton operating a landfill gas well drill for Landmarc at the Green Valley landfill (owned by Republic Waste Services, Inc.) in Kentucky. *See* Thomas Lafollette Aff.

CEC was confident that Slayton was doing more for Landmarc than offsite supervision of landfill drilling projects, and it therefore issued a subpoena to Landmarc on June 29, 2017 to determine the full scope of his duties. Carlson Aff., ¶¶ 38-43. After Landmarc objected to the subpoena and counsel negotiated a resolution, Landmarc produced two sets of documents: personnel file documents on August 9, 2017 and landfill gas well drilling records and logs on August 23, 2017. *Id.*

CEC was finally able to obtain a more detailed understanding of Slayton's activities through Landmarc's subpoena production. It is now evident that no action CEC has taken thus far, including the cease and desist letter, filing the lawsuit, and defeating Slayton's motion to dismiss, has stopped Slayton's blatant disregard of his CEC noncompetition covenants. *See, e.g.,* Carlson Aff., at ¶¶ 35-46. A summary of Slayton's activities as a Landmarc employee are detailed below.

Since January 10, 2017, Slayton has been employed by Landmarc as a Superintendent, and in that position, he is performing the exact same services he provided for CEC. Slayton has supervised employees who perform landfill gas well drilling, he has consulted and provided

technical assistance to those employees and he has personally operated drills on landfill gas well drilling projects for Landmarc in several states. *Id.* at ¶ 29; *See* Brent Ross Aff.; Thomas Lafollette Dec.; and Motion for Preliminary Injunction - proposed Exhibits 3 and 4 (documents subpoenaed from Landmarc) to be filed under seal pending the Court's approval. Landmarc has ceased doing business with CEC since Slayton became its employee. Carlson Aff., ¶¶ 30, 42-43.

Upon becoming employed at Landmarc, Slayton falsely represented that he was not by any covenant not to compete that prevented him from becoming a Landmarc employee. Moreover, after the filing of this lawsuit, Landmarc directed Slayton not to engage in certain activities in violation of his CEC Agreement, but Slayton has consistently done so through the present. *Id.* at ¶ 42.

Since January, 2017, Slayton has continuously performed landfill well gas drilling services for Landmark in direct violation of his CEC covenant not to compete. Slayton has, at a minimum, performed drilling work for Landmarc on landfill gas well drilling projects in Kentucky, Indiana, Oklahoma, Texas, Missouri, all of which are within the Territory defined in his CEC Agreement and is in direct violation thereof. *Id.* at ¶ 43.

Slayton has also solicited landfill gas well drilling business from CEC customers BEL Engineering, SCS Field Services and Enerdyne Power Systems, Inc. *Id.* at ¶ 31. CEC no longer receives work from former customers BEL Engineering and Advanced One. Nunes Aff., ¶ 6. BEL Engineering now uses Landmarc for its drilling work instead of CEC. Carlson Aff., ¶ 31.

One of CEC's major concerns has been that its competitive position with major clients such as Waste Management Services, Inc. and Republic Services, Inc. has been diminished since Slayton became employed with Landmarc. There are many landfills with recurring gas well drilling projects that CEC had worked on before Slayton joined Landmarc. However, since

January 2017, CEC's work at these sites has declined substantially, and CEC has submitted bids in competition with Landmarc for additional work at these sites and, for the first time, CEC has been losing out to Landmarc. The degree to which this has occurred since January, 2017, is unprecedented. Nunes Aff., ¶ 3.

Landmarc has been able to obtain landfill gas well drilling work on at least 11 projects where CEC had previously performed that same work either exclusively or through Landmarc. CEC is not performing any of the landfill gas well drilling work at these 11 landfills. Prior to January 2017, Landmarc was not generally successful in outbidding CEC for these projects. CEC has every reason to believe that the difference since January, 2017, is that Sean Slayton, who was directly involved in formulating and pricing bids for CEC, is now divulging CEC's confidential pricing information and unique bidding strategies to Landmarc which is allowing them to unfairly compete against CEC for projects. This has had a devastating impact on CEC's revenues for 2017 in the hundreds of thousands of dollars and threatens to continue to undermine our competitive position in the landfill gas well drilling industry and to damage CEC financially if we continue to lose out on future drilling projects. Nunes Aff., ¶ 4. CEC has lost bids for drilling projects to Landmarc at the Hickory Hill landfill in South Carolina and the Oakridge Landfill in South Carolina. CEC lost the Arbor Hills project to Landmarc specifically due to lower bid prices by Landmarc. CEC lost the Hickory Hill and Oakridge projects very closely and in both instances, Landmarc was a drilling subcontractor for the project's general contractor, BEL Engineering. *Id.* at ¶5.

Slayton has also been involved in the solicitation and recruitment of at least three former CEC employees: Josh Goosman, Charles Slayton and Sean Slayton's son Austin Slayton. These

activities are in direct violation of his employee non-solicitation provision in Section 5 of his CEC Agreement. Carlson Aff., ¶¶ 44, 46; Nunes Aff., ¶ 8.

Slayton has recently been in contact with one of CEC's suppliers, Bauer-Pileco, in order to purchase or lease drilling equipment on behalf of Landmarc in violation of the supplier non-solicitation provision of his CEC Agreement. Bauer-Pileco sells and leases drilling equipment and was a supplier CEC has frequently used for this purpose. Nunes Aff., ¶ 7.

In summary, Slayton is violating nearly every aspect of his CEC noncompetition provisions. This includes Slayton's use of the most significant assets his former company QDS sold to CEC: client information, client contacts, goodwill, and other confidential information which CEC intended to use fully and exclusively to benefit and grow its business. Now, Slayton is using that very information which now belongs to CEC to unfairly compete against CEC and to help CEC's direct competitor, Landmarc. If Slayton is allowed to continue to violate the agreement and compete against CEC he will continue to use CEC's confidential information and take business away from CEC, harm CEC's customer relationships and goodwill.

## III. ARGUMENT

### A. Legal Standard

In order to obtain a preliminary injunction, CEC must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). In the instant case, each of these factors weighs in favor of CEC, such that its motion for a preliminary injunction against Slayton should be granted.

**B. <u>CEC is Likely to Succeed on the Merits of its Breach of Contract Claim</u>**

Parties seeking a preliminary injunction must demonstrate that they are likely to succeed on the merits. *Winter*, 555 U.S. at 20, 129 S. Ct. at 374. This inquiry requires that the movant make a "clear showing" that he is likely to succeed at trial, though that does not require the movant to show a certainty of success. *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013). CEC is likely to succeed on the merits of its breach of contract claim, because Slayton has violated and continues to violate the Noncompetition covenant contained in his CEC Agreement.

The elements for a breach of contract claim under North Carolina law are "(1) [the] existence of a valid contract and (2) breach of the terms of that contract." *Samost v. Duke Univ.*, 742 S.E.2d 257, 260 (N.C. Ct. App. 2013).

**1. Slayton's Noncompetition Agreement is Valid and Enforceable**

A restrictive covenant between an employer and an employee is valid and enforceable under North Carolina law if it is: "(1) in writing; (2) reasonable as to terms, time, and territory (3) made part of the employment contract; (4) based on valuable consideration; and (5) not against public policy." *Triangle Leasing Co., Inc. v. McMahon*, 327 N.C. 224, 228, 393 S.E.2d 854, 857 (1990); *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 649-50, 370 S.E.2d 375, 380 (1988). In order for a restrictive covenant to not be against public policy, it "must be no wider in scope than is necessary" to protect the legitimate business interests of the employer. *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 656, 670 S.E.2d 321, 327 (2009). Slayton's Noncompetition provision satisfies each of the criteria for an enforceable agreement as set forth below:

First, the Noncompetition provision is in writing and is part of his CEC Employment Agreement, thereby satisfying the first and third elements of a valid noncompetition agreement. *See* Carlson Aff., Exh. 1.

Second, the Noncompetition provision was entered into as an express condition of Slayton's employment with CEC and is therefore based on valuable consideration. *See* Carlson Aff., ¶ 9 and Exh. 1 at p. 1 ("in consideration of Employer's hiring of Employee as an at-will employee and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged . . ."); *See also, Greene Co. v. Kelley*, 261 N.C. 166, 134 S.E.2d 166 (1964)) ("The promise of new employment will serve as valuable consideration and support an otherwise valid covenant.").

Third, the Noncompetition provision is designed to protect CEC's legitimate business interests. *See* Carlson Aff., ¶ 10 and Exh. 1, Recitals (agreement is entered into "for the protection of Employer's Business, goodwill, trade secrets and other confidential information."). First, Slayton's Agreement recites that it is being entered into "in order to protect Employer from unfair competition, and to prevent the unauthorized disclosure or use of Employer's Confidential Information, Employee agrees . . ." Carlson Aff., ¶10 and Exh. 1, Secs. 4.a., 4.c. Slayton's duties included serving as a client liaison which resulted in frequent personal contact with CEC's clients, and it was therefore critical to protect the important customer relationships from misappropriation by Slayton. *Id.* at ¶¶ 20-21; *See Kuykendall*, 322 N.C. at 651, 370 S.E.2d at 381 ("protection of customer relations and goodwill against misappropriation by departing employees is well recognized as a legitimate protectable interest of the employer."); *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 408, 302 S.E.2d 754, 763 (1983). Second, Slayton agreed that CEC's business was highly competitive and involved the use of trade secrets and confidential information and that if Slayton accepted employment from a competitor, this would give the competitor an unfair advantage and would threaten the unauthorized disclosure of CEC's confidential information. *Id.* at ¶¶ 10-13 and Exh 1 at Sec. 3.a; *See, e.g., Elec. S., Inc. v.*

*Lewis*, 96 N.C. App. 160, 165-66, 385 S.E.2d 352, 355-56 (1989)(confidential information and trade secrets are legitimate protectable interests). Slayton acknowledged that he would become privy to CEC's Confidential Information and that he was prohibited from misappropriating the same. *Id.* and Exh. 1, Sec. 3. CEC's Confidential Information includes information relating to customers' requirements, which gives it a competitive advantage. *Id.*, ¶ 5. Finally, CEC has a legitimate interest in protecting its business' goodwill, including the goodwill of QDS it purchased in November 2015. *Id.* at ¶¶7-9 and Exh. 1, Sec. 5 (referencing purchase of QDS's customer relationships).

Fourth, the Agreement is reasonable as to time and territory. *Farr Associates, Inc. v. Baskin*, 138 N.C. App. 276, 280, 530 S.E.2d 878, 881 (2000).

***a. The Geographic Scope of the Covenant is Reasonable***

CEC's nationwide geographic territory is directly related to the area where CEC conducts and is expanding its business, where it has a legitimate interest in protecting itself from unfair competition and in protecting its customer relationships and it corresponds to where Slayton performed services for it. *See* Carlson Aff., ¶¶ 2-3, 5-6, 20-22. Each of these factors favors CEC and the reasonableness of the geographic territory. *See Farr Assoc.*, 138 N.C. App. at 281-82, 530 S.E.2d 882.

CEC provides its services and has offices "*across the United States*". Carlson Aff., ¶¶ 2-3, 5-6. (Emphasis added). CEC's two most important customers, Waste Management, Inc. and Republic Waste Services, Inc., are *national* companies that own and operate landfills across the United States. *Id.* at ¶5. Before, during and after Slayton's employment, CEC has continued to expand the footprint of its business by and through these two critically important national customers *Id.* at ¶6 (Waste Management's "National Drilling Services Price Proposal). Slayton

acknowledged that the Restricted Territory was reasonable "[i]n recognition of the *nationwide basis* of the Employer's Business." *Id.* at Exh. 1, Sec. 4.d (Emphasis added). During Slayton's employment with CEC, CEC bid on projects throughout the United States and Slayton provided landfill gas well drilling services "exclusively for CEC *all over the United States*." *Id.* at ¶¶ 22-23 (Emphasis added).

The nationwide geographic territory in Slayton's non-compete is reasonable and enforceable, as it corresponds to the area in which CEC conducts its business and where its customers are located. *Manpower of Guilford County, Inc. v. Hedgecock*, 42 N.C. App. 515, 523, 257 S.E.2d 109, 115 (1979). Similar territorial restrictions have consistently been deemed valid and enforceable by our courts. *See Agdata, LP v. Gupta*, 2008 U.S. Dist. LEXIS 104264, at *5-6 (W.D.N.C. Oct. 31, 2008)(nationwide territory); *Okuma America Corp. v. Bowers*, 181 N.C. App. 85, 638 S.E.2d 617 (2007)(customer non-solicitation provision extending through North and South America); *Cole v. Champion Enters., Inc.*, 305 Fed. Appx. 122, 130 (4th Cir. 2008)(3-year, nationwide non-compete).

Based on the foregoing, the territory in the Slayton Agreement is reasonable.

***b. The Two-Year Time Restriction is Reasonable***

A two-year noncompetition agreement is "well within the range that the North Carolina courts have deemed reasonable." *See Static Control Components, Inc. v. Darkprint Imaging, Inc.*, 240 F. Supp. 2d 465, 474 (M.D.N.C. 2002) (a covenant not to compete of two years is not per se unreasonable); *ABT, Inc. v. Juszczyk*, 2010 U.S. Dist. LEXIS 91613 (W.D.N.C. 2010)(2 year, nationwide noncompete); *Kinesis Adver., Inc. v.* Hill, 187 N.C. App. 1, 14, 652 S.E.2d 284, 294-95 (N.C. App. 2007)(2-year non-compete).

The fact that Slayton's non-compete arose out of the sale of a business is significant, because these circumstances provided CEC with broader discretion in formulating the terms of its non-compete with a key principal of the purchased business, and the analysis thereof is not subject to the strict scrutiny reserved for garden variety employment non-competes. *See* Carlson Aff., ¶¶ 7-9; *See, e.g., Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 662-63, 158 S.E.2d 840, 843-44 (1968)(citing cases enforcing noncompetes from 7 to 20 years, and enforcing Morrow's 10-year noncompete incidental to sale of business); *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 226, 333 S.E.2d 299, 304-04 (1985)(enforcing 7-year noncompete incidental to sale of business). Sale of business non-competes are provided greater latitude under the law and are "not be narrowly, technically construed" because the seller has sold its good will to the purchaser and has been adequately compensated for his agreement not to compete against the buyer and not unfairly trade on that good will. *See Outdoor Lighting Perspectives Franchising, Inc. v. Harders*, 228 N.C. App. 613, 622-23, 747 S.E.2d 256, 263-64 (2013).

The two year time restriction is reasonable under the facts and authorities described above.

Finally, the Agreement is not against North Carolina public policy. The Agreement is not broader than necessary to protect CEC's valuable customer relationships and confidential information across the United States which it has cultivated and protected for over 13 years. *See Kuykendall*, 322 N.C. at 651, 370 S.E.2d at 381.

**2. Slayton Has Breached, and Continues to Breach, His Noncompetition Covenant**

CEC is likely to succeed on the merits of its breach of contract claim, because Slayton has continuously violated his noncompetition agreement by performing the same or substantially similar services for a direct competitor within the restricted territory since January 2017. *See*

Carlson Aff., ¶¶ 36-43. First, Slayton has been drilling and supervising drilling for Landmarc, a direct competitor, within the Restricted Territory. *Id.*; *See* Lafollette Dec., ¶4; Ross Aff., ¶4; Nunes Aff., ¶¶ 3-6. Second, Slayton has solicited CEC employees who are now working at Landmarc. Nunes Aff., ¶8; Carlson Aff., ¶¶ 44, 46; *See* Lafollette Dec., ¶ 4. Third, Slayton has contacted CEC suppliers to conduct business with them relating to drilling. Nunes Aff., ¶7. Fourth, it is very likely that Slayton is using confidential pricing and other bidding information to unfairly compete against CEC. *See, generally* Nunes Aff., ¶¶ *See* Carlson Aff., ¶¶47-48. Each of these examples would constitute a breach of his Agreement, but Slayton is engaged in all of the described behavior.

**C. CEC Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction**

The preliminary injunction standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22, 129 S. Ct. at 374. Irreparable injury includes injury for which a monetary award would be inadequate, or for which a monetary award is incalculable. Irreparability of harm includes the impossibility of ascertaining with any accuracy the extent of the loss, for example the inability to calculate the extent of sales the plaintiff's competition will cause it to lose, and the "far-reaching, effects upon its good will. . ." *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 197 (4th Cir. 1977). Irreparable injury is injury that is both actual and immediate. *Dan River, Inc. v. Icahn*, 701 F.2d 278, 284 (4th Cir. 1983); *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994)("[I]rreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate."). "[T]he threat of . . . the potential loss of goodwill [ ] support[s] a finding of irreparable harm" in the preliminary injunction analysis. ***Id.*** at 552.

CEC's evidence establishes that it has, and will continue to suffer, actual, imminent and irreparable harm if Slayton's continued violation of his noncompetition agreement is not enjoined. Slayton's actions have interfered with and permanently damaged CEC's goodwill and relationship with its customers. If Slayton is not enjoined, he will be in a position to continue to unfairly compete against CEC and damage CEC's position in the industry and its client relationships. The potential monetary impact could be so significant that it could have a devastating impact on CEC's business, such that the damages could not be adequately remedied or measured with monetary damages. *See* Carlson Aff., ¶¶47-48; Nunes Aff., ¶¶ 4-10. Slayton recognized in his CEC Agreement that his violation of the noncompetition provisions would cause irreparable harm to CEC. Carlson Aff., Exh 1, Sec. 6. Since Slayton joined Landmarc in January, 2017, CEC has lost an unprecedented number of bids to Landmarc, its relationships with crucial customers Republic and Waste Management have been impaired and its capacity to compete has been harmed in ways from which it might not recover. *See* Carlson Aff., ¶¶47-48; Nunes Aff., ¶¶ 4-10. These are not finite and isolated incidents, but are harms that will continue to occur unless Slayton is ordered to comply with his CEC Agreement.

**D. The Balance of the Equities is in CEC's Favor**

In order to obtain a preliminary injunction, CEC is required to demonstrate that the balance of equities tips in its favor. *Winter*, 555 U.S. at 20, 129 S. Ct. at 374. In this case, the balance is squarely in CEC's favor.

Slayton acknowledged in the CEC Agreement that "his experience and capabilities are such that enforcement of the provisions of this Agreement will not prevent Employee from earning a livelihood." Carlson Aff., Exh. 1, Sec. 6.c.; *See Phillips Elecs. N. Am. Corp. v. Hope*, 631 F.Supp.2d 705, 709 (M.D.N.C. June 30, 2009)(noting significance of such language in

issuing a preliminary injunction). Thus, an injunction would only require Slayton to do that which he agreed to do in the CEC Agreement and would prevent him from continuing to harm CEC and its customer relationships. *Id.* at 711.

The damage that would result if Slayton were allowed to continue to violate his noncompetition agreement outweighs any harm to Slayton from enforcement of the noncompetition agreement that he agreed to abide by as a condition of his employment at CEC. Accordingly, any harm that Slayton suffers is a direct consequence of his own failure to abide by the CEC Agreement. *See Meineke Car Car Ctrs., Inc. v. Catton*, 2010 U.S. Dist. LEXIS 146494, *10-11 (W.D.N.C. June 24, 2010).

Slayton recognized the importance of the protections provided to CEC through the noncompetition agreement by agreeing to a tolling provision which would extend the time restriction for any period of violation. Such tolling provisions are valid under North Carolina law. *See Phillips Elecs.*, at 718; *Southtech Orthopedics, Inv. v. Dingus*, 428 F. Supp. 2d 410, 417 (E.D.N.C. 2006); *QSP, Inc. v. Hair*, 152 N.C. App. 174, 177-78, 566 S.E.2d 851, 853 (2002). In agreeing to this provision, Slayton recognized the importance of CEC being allowed the full benefit of the protection against unfair competition provided for in Slayton's agreement.

There are other facts that tip the balance of equities in CEC's favor. First, any argument Slayton might make that enforcement of CEC's noncompetition agreement is somehow unfair is substantially undermined by the fact that Landmarc uses, and required Slayton to sign, a restrictive covenant that is very similar in effect to that which CEC seeks to enforce. *See Superior Performers, Inc. v. Meaike*, 2014 U.S. Dist. LEXIS 50302, * 52-53 (M.D.N.C. April 11, 2014). Second, on March 29, 2017, presumably in response to CEC's cease and desist letter, Landmarc issued a letter to Slayton directing him not to engage in certain activities, however, the

letter notably ignores the most basic provision of Slayton's agreement, which prohibits his providing the same services for Landmarc that he provided to CEC. Landmarc thus ratified and is complicit in Slayton's continued violation of CEC's agreement, thus providing yet another reason why an injunction is necessary to obtain Slayton's compliance.

**E. Issuance of an Injunction is in the Public Interest**

Granting a preliminary injunction is in the public interest, because it is beneficial to the public for Courts to enforce agreements that private parties enter into knowingly and voluntarily. *See In re Irrevocable Standby Letter of Credit No. SE444393W*, 336 F. Supp. 2d 578 582-83 (M.D.N.C. 2004); *McFadden v. Amoco Oil Co.*, 486 F. Supp. 274, 276 (D.S.C. 1979) ("[t]he public interest is such that citizens should be able to make contracts with confidence and expect that these contracts would be performed"); *See also Phillips Elecs.*, 631 F.Supp. 2d at 724 (the public interest is served by "ensuring that contracts are enforced" and preventing "unethical business behavior")(citing *UBS PaineWebber, Inc. v. Aiken*, 197 F. Supp. 22d 436, 448 (W.D.N.C. 2002)). If Slayton is not enjoined, he will continue to unfairly compete against CEC to CEC's substantial detriment. CEC has a legitimate interest in developing its customer relationships and being able to share confidential information with its employees without fearing that it will end up in the hands of a competitor. *Travenol Labs., Inc. v. Turner*, 30 N.C. App. 686, 691, 228 S.E.2d 478, 483 (1976). The interest in enforcing valid contracts outweighs the interest in Slayton's freedom to pursue employment in a manner that contravenes the restrictive covenant. *See Superior Performers*, 2014 U.S. Dist. LEXIS 50302, at *16-17. Accordingly, injunctive relief is in the public interest, and CEC is entitled to a preliminary injunction.

## IV. CONCLUSION

For the reasons set forth herein and in the accompanying affidavits and documents submitted in support of this Motion, Plaintiff respectfully moves the Court to enter a preliminary injunction against Defendant Sean Slayton.

## CERTIFICATION

The undersigned counsel for Plaintiff hereby certifies that, in accordance with the Case Management Order, this Memorandum of Law is less than 6,000 words, excluding caption, certifications and signature blocks.

This the 31st day of August, 2017.

***s/G. Bryan Adams, III***
G. Bryan Adams, III
N.C. Bar No. 17307
VAN HOY, REUTLINGER, ADAMS & DUNN, PLLC
737 East Boulevard
Charlotte, North Carolina 28203
Telephone: (704) 375-6022
Fax: (704) 375-6024
Email: bryan.adams@vradlaw.com

**ATTORNEYS FOR PLAINTIFF CARLSON ENVIRONMENTAL CONSULTANTS, PC**

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2017, I electronically filed the foregoing MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record for the Defendant:

Mindy C. Wudarsky
mwudarsky@teaguecampbell.com
William A. Bulfer
wbulfer@teaguecampbell.com
Teague, Campbell, Dennis & Gorham, L.L.P.
22 South Pack Square, Suite 800
Asheville, NC 28801

This 31st day of August, 2017.

*/s/G. Bryan Adams, III*
G. Bryan Adams, III (NC Bar No. 17307)
VAN HOY, REUTLINGER, ADAMS & DUNN, PLLC
737 East Boulevard
Charlotte, North Carolina 28203
Telephone: (704) 375-6022
Fax: (704) 375-6024
Email: bryan.adams@vradlaw.com
**Attorneys for Plaintiff**