UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

CASE NO. 3:17-cv-149-FDW-DCK

| | | |
|---|---|---|
| CARLSON ENVIRONMENTAL CONSULTANTS, PC, | ) ) ) | |
| Plaintiff, | ) ) | **RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR** |
| v. | ) ) | **PRELIMINARY INJUNCTION** |
| SEAN SLAYTON, | ) ) | |
| Defendant. | ) ) | |

Plaintiff's Motion for Preliminary Injunction seeks to prevent Sean Slayton from utilizing his work experience and skills gained before his employment with Plaintiff to drill holes in the ground on projects awarded to his current employer before he was hired and at prices that were negotiated and agreed upon before he was hired. Plaintiff did not train Slayton to drill or provide him with any new skills or techniques. Slayton performs drilling work following specific location and depth instructions created by engineers. Further, the prices Plaintiff charges for the drilling work are widely known and Plaintiff freely provided those prices to Slayton's current employer, Landmarc Environmental Systems ("Landmarc"), before he was hired. While working for Landmarc, Slayton has only worked on projects for which Plaintiff could not compete, chose not to compete, was not invited to compete, and/or on which lost the bid to an entity that is not Slayton's current employer. Plaintiff has no legitimate, protectable business interest in preventing Slayton from drilling holes, yet preventing Slayton from drilling would deprive him of the only livelihood he has ever known.

1

Plaintiff's decision to wait more than seven months before seeking a preliminary injunction demonstrates the lack of any irreparable harm. Plaintiff terminated Slayton in December of 2016, knew he was employed with his current employer in January of 2017 and delayed filing any lawsuit until March of 2017. Once the lawsuit was filed, Plaintiff delivered just one third party subpoena, in July of 2017, and did not serve any discovery on Slayton (and as of September 11, 2017, still had not responded to Slayton's overdue discovery). It then waited until August 31, 2017 to file any request for injunctive relief. Despite the passage of seven months since Plaintiff knew of Slayton's current employment, Plaintiff presents the relief it seeks as urgently needed to protect some valuable, confidential information and now seeks to extend its relief against Slayton for the same amount of time by which it has delayed. Plaintiff bases its request for relief on an unenforceable two-year, nationwide non-compete agreement that it imposed on Slayton several months after it hired him, without any additional consideration. Plaintiff seeks the extraordinary relief of preventing Slayton from working anywhere in the United States, despite admitting that it does not compete for drilling jobs in all fifty states and despite admitting that Slayton did not work in all fifty states when employed by Plaintiff. Plaintiff's Motion is supported by nothing more than bald assertions and speculation and should be denied.

## STATEMENT OF RELEVANT FACTS

Defendant Sean Slayton ("Slayton") began his career immediately after high school as a recovery technician, removing hazardous waste from various sites and environmental disasters. *See* Slayton Aff. ¶ 2. He worked his way up and ultimately became a landfill gas well driller. *See* Slayton Aff. ¶ 3-4. Slayton has been drilling for approximately 18 years. *See* Slayton Aff. ¶ 4. He has no other education, training, certifications, or experience. *See* Slayton Aff. ¶ 2-4.

2

In 2007, Slayton's wife formed a company, Quality Drilling Service ("QDS"). *See* Slayton Aff. ¶ 5. Slayton began working for QDS as a driller, but did not own an interest in the company. *See* Slayton Aff. ¶ 6. QDS performed landfill gas well drilling pursuant to subcontracts it entered into with general contractors who performed more comprehensive waste management work. *See* Slayton Aff. ¶ 8. While employed for QDS, Slayton did not set pricing. *See* Slayton Aff. ¶ 17-18.

During the summer of 2015, Plaintiff Carlson Environmental Consultants, PC ("Plaintiff" or "CEC") began discussions and negotiations to purchase the assets of QDS. *See* Memorandum of Law in Support of Motion for Preliminary Injunction ("Memorandum") [Doc. 17] p. 3. In July of 2015, Slayton began his employment with CEC. *See* Slayton Aff. ¶ 10. On November 19, 2015, CEC purchased the assets of QDS. Memorandum [Doc. 17] p. 4. As Slayton was not an owner of QDS, he did not receive any of the proceeds from that sale. *See* Slayton Aff. ¶ 11.

After Slayton began his employment with CEC, he drilled gas wells onsite at various landfills. *See* Slayton Aff. ¶ 10, 13. CEC performed general contractor services, contracting directly with landfill owners and operators for more comprehensive waste management projects, which included engineering and construction quality assurance, along with drilling and other construction work. *See* Slayton Aff. ¶ 13. CEC also subcontracted some drilling work from other prime contractors. *See* Slayton Aff. ¶ 13. Slayton's work consisted primarily of the subcontracted drilling work. *See* Slayton Aff. ¶ 16.

Slayton was not involved and did not participate in the pricing or bidding for any of the general contracting work performed by CEC. *See* Slayton Aff. ¶ 17. Slayton did not perform any of the other contracting work under the general contracts awarded to CEC. His work was limited to the actual drilling of holes at locations and depths selected by others. *See* Slayton Aff. ¶ 20,

3

21, 28. With regard to the subcontracted drilling work, Slayton was at times aware of the price that was quoted or invoiced to the general contractor—but Slayton was not involved in preparing the bids or determining the prices that were quoted. *See* Slayton Aff. ¶ 17, 19. Slayton did not have any information about CEC's pricing that was not previously made available to all of the contractors with which CEC worked, including Slayton's current employer, Landmarc. *See* Slayton Aff. ¶ 19.

Slayton did not learn any confidential information or trade secrets while employed by CEC. He was not trained by CEC for any of the work he performed. *See* Slayton Aff. ¶ 29. Landfill gas well drilling does not involve the use of confidential information or trade secrets. *See* Slayton Aff. ¶ 21. A driller does not select the location or depth for drilling holes. Instead, engineers stake the ground and provide specific instructions on where and how deep to drill. *See* Slayton Aff. ¶ 21. Slayton was not involved in CEC's decisions to give raises or bonuses to the employees performing drilling work for CEC, and was generally unaware when raises or bonuses were given. *See* Slayton Aff. ¶ 23.

In December of 2016, CEC terminated Slayton's employment for what it has characterized as "job-related misconduct and failure to operate CEC's drilling business in an acceptable manner." *See* Slayton Aff. ¶ 24 and Memorandum [Doc. 17] p. 6. Vince Coleman, a principal of CEC, told Slayton he was fired, that Slayton could do what he wanted, and that he could take both of his sons with him. *See* Slayton Aff. ¶ 25. At that time, Slayton's sons, Chaz and Austin, also worked for CEC. *See* Slayton Aff. ¶ 26.

On January 16, 2017, Slayton began working as a drill rig operator for Landmarc. *See* Slayton Aff. ¶ 27-28. Most of the work that he has performed for Landmarc is pursuant to a contract between Landmarc and Republic Services Procurement, Inc. that was negotiated and

4

awarded to Landmarc before Slayton became employed by Landmarc. *See* Slayton Aff. ¶ 29. The prices for drilling work that Landmarc performs for Republic Services were negotiated in 2015 and fixed for a three-year term, from January 1, 2016, through December 31, 2018. *See* Landmarc Aff. ¶ 5. The Republic-Landmarc Master Agreement ("MSA") under which Slayton drills was negotiated in 2015, for a three year term, from January 1, 2016 through December 31, 2018, before Slayton was employed by Landmarc. *See* Landmarc Aff. ¶ 5, 10.   As such, the agreement was fixed before Slayton became employed by Landmarc and extends beyond the expiration of Plaintiff's non-compete.  Thus, Slayton cannot be said to have <u>any</u> impact on CEC or Landmarc's ability to compete for this work.

Similarly, the remaining sites on which Slayton has worked could not have resulted from any unfair advantage gained by Slayton's prior employment with CEC.  Slayton has worked for the city of Amarillo, Texas.  This work was obtained by Landmarc through a competitive and open bid process. CEC did not bid for this project. *See* Aff. Landmarc 13, 15.

The Arbor Hills, Kentucky site identified in plaintiff's brief was subcontracted to the bid winner, BEL Environmental (BEL)[1]. *See* Aff. Landmarc. ¶ 13, 16.   Contrary to Plaintiff's assertions, CEC did not lose bids for this project to Landmarc.  Rather, it lost out to BEL. *See* Aff. Landmarc. ¶ 16.   BEL solicited quotes from several drilling companies, not including CEC, and ultimately awarded the subcontract to Landmarc. *See* Aff. Landmarc. ¶ 16.   CEC was not asked to bid.  Slayton has not solicited any work from BEL. *See* Aff. Landmarc ¶ 16.   Moreover, as early as June, 2016, CEC had decided to eliminate BEL from its list of preferred drilling clients. *See* Aff. Slayton ¶ 14.

---

[1] The bid also pertained to work at two sites in South Carolina, Hickory Hill and Oakcridge.  Slayton did no work at the South Carolina sites.

5

The remaining drilling work performed by Slayton had been obtained by Landmarc, as a result of long standing personal and professional relationships with existing clients. *See* Aff. Yuhua Ma.

The sworn testimony of both owner and construction manager of Advanced One Development, both of whom refute plaintiff's baseless accusation that Advanced One was solicited by Slayton. *See* Aff. Brinker ¶ 3 and Aff. Murrer ¶ 4. Of note, Plaintiff's discovery responses, produced on September 12, 2017, specifically identify Mr. Murrer as having been directly contacted by Slayton. Carlson Interrogs., p. 8. This allegation has now been refuted, under oath.

Slayton is not and was not involved in the solicitation, pricing, bidding, or negotiation of any of the work that Landmarc performs for any of its customers. *See* Landmarc Aff. ¶ 11. Slayton has not solicited any work for Landmarc, and has not shared with Landmarc any confidential information or trade secrets belonging to CEC. *See* Landmarc Aff. ¶ 12. Slayton has not shared with Landmarc any of CEC's price formulations, methods of calculating bids, or any other information relating to CEC's pricing or bidding process. *See* Landmarc Aff. ¶ 12. Likewise, Slayton has not shared any of the salaries or other compensation CEC pays to its employees. *See* Landmarc Aff. ¶ 12. CEC's discovery responses further reveal that its allegation that Slayton solicited employees is baseless. *See* Carlson Interrogs. No. 5 (admitting is "is not known" when Slayton allegedly recruited any employees, producing no evidence of what he allegedly said, and admitting Slayton has spoken with but "has not directly tried to hire" current CEC driller Shane Simpson – evidencing Slayton's compliance with the covenant). Neither Slayton nor Landmarc are performing any drilling work pursuant to a contract between Landmarc and Waste Management. *See* Landmarc Aff. ¶ 13.

6

CEC now seeks to enforce its November 19, 2015 Confidentiality and Noncompetition Agreement, which was executed four months after Slayton began working for CEC and without consideration. CEC can show no legitimate interest that it seeks to protect with the enforcement of this agreement. It can show no irreparable harm. The covenant not to compete is overly broad, and the equities favor denying CEC's Motion.

## ARGUMENT

### A. Legal Standard

"A preliminary injunction is an extraordinary remedy, to be granted only if the moving party clearly establishes entitlement to the relief sought." *Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir.1997). Federal courts sitting in diversity apply federal standards when assessing requests for preliminary injunctions. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir.1991). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). "The plaintiff bears the burden of establishing that these factors favor granting the injunction." *Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir. 1997). Finally, "the plaintiff must make a clear showing of actual, imminent, and irreparable harm, as well as the inadequacy of legal remedies, to warrant further consideration under the four-factor test." *In re Irrevocable Standby Letter of Credit No. SE444393W*, 336 F.Supp.2d 578, 581 (M.D.N.C. 2004). Here, all four of the factors weigh against CEC's requested relief, and its Motion should be denied.

### B. CEC Is Unlikely to Succeed on the Merits Because the Non-Compete Is Unenforceable.

7

North Carolina courts disfavor restrictive covenants, closely scrutinizing them for invalidity. *See, e.g.*, *Outdoor Lighting Perspectives Franchising, Inc. v. Harders*, 228 N.C. App. 613, 620, 747 S.E.2d 256, 262 (2013). For a restrictive covenant to be valid, a plaintiff must demonstrate that the covenant is (1) in writing, (2) part of the employment contract, (3) based on valuable consideration, (4) reasonable as to time and territory, and (5) designed to protect a legitimate business interest. *See Hejl v. Hood, Hargett & Assocs., Inc.*, 196 N.C. App. 299, 304, 674 S.E.2d 425, 428 (2009). "The party who seeks enforcement of the covenant has the burden of proving the reasonableness of the agreement." *Medical Staffing Network, Inc. v. Ridgeway*, 194 N.C. App. 649, 655, 670 S.E.2d 321, 327 (2009). CEC has not met that burden here.

1. **The Non-Compete CEC Seeks to Enforce Does Not Support Any Legitimate Business Interest.**

In support of its position that the non-compete supports a legitimate business interest, CEC simply quotes the Confidentiality and Noncompetition Agreement, and then states that it has an interest in protecting customer relationships from "misappropriation" and that his subsequent employment "would give the competitor an unfair advantage and would threaten the unauthorized disclosure of CECs confidential information." Memorandum [Doc. 17] p. 13. Yet, in all of its affidavits and exhibits, CEC has offered no evidence of misappropriation of customer relationships or disclosure of CEC's confidential information by Slayton. Moreover, the evidence establishes that Slayton has not misappropriated customer relationships or disclosed confidential information. *See* Slayton Aff. ¶ 31, 32, 33, 38, 39. In fact, the evidence shows that Slayton is not in possession of any trade secrets or confidential information to disclose. *See* Slayton Aff. ¶ 29.

8

The majority of Slayton's work is operating a drill rig at landfills owned by Republic Services under a contract negotiated between Republic Services and Landmarc in 2016, before Landmarc hired Slayton. *See* Landmarc Aff. ¶ 14. The price for drilling work for that contract was negotiated between Republic Services and Landmarc in 2015, and that price remains fixed through 2018. *Id*. Similarly, the remaining work Slayton is performing is work that CEC either (1) did not bid on, (2) lost to a separate competitor, or (3) was not invited to bid on. *See* Landmarc Aff. ¶ 15-20. CEC has no legitimate business interest in such work. Landmarc has no current contract with the second of Plaintiff's "most important clients", Waste Management, and Slayton has not performed work pursuant to any contract between Waste Mangement and Landmarc. *See* Landmarc Aff. ¶ 13.

Slayton's alleged knowledge of CEC's pricing (knowledge Landmarc already had by virtue of its contracts with CEC), could not benefit Landmarc even if Slayton had shared that information, which he did not. When Landmarc engages CEC as a drilling subcontractor, CEC invoices Landmarc for work done. CEC, in the ordinary course of business, has disclosed to Landmarc the prices CEC charges. *See* Landmarc Aff. ¶ 9. As a result, Plaintiff cannot claim its pricing was confidential, or that it took steps to protect it as confidential, when it regularly places the very information it is now seeking to protect in the hands of third parties, including Slayton's current employer.

**2. The Covenant Not to Compete is Not Reasonable as to Time or Territory.**

CEC's non-compete covenant is also invalid and unenforceable due to its unreasonable geographic and temporal scope. North Carolina courts analyze the two as a whole, considering six factors:

9

> (1) the area, or scope, of the restriction; (2) the area assigned to the employee; (3) the area where the employee actually worked or was subject to work; (4) the area in which the employer operated; (5) the nature of the business involved; and (6) the nature of the employee's duty and his knowledge of the employer's business operation.

*Horner International Co. v. McKoy*, 232 N.C. App. 559, 565, 754 S.E.2d 852, 857 (2014).

Another "major consideration in determining the reasonableness of restrictions as to time and territory relates to the type of position occupied by the employee, and the skills and/or knowledge obtained by the employee <u>while under employment</u>." *Manpower of Guilford Cty., Inc. v. Hedgecock*, 42 N.C. App. 515, 521, 257 S.E.2d 109, 114 (1979) (emphasis added). The geographic territory used within a restrictive covenant can be no greater than is reasonably necessary to secure the protection of the business or good will of the employer. *Id.* Where the alleged primary concern is the employee's knowledge of the customers, "the territory should only be limited to areas in which the employee made contacts during the period of his employment." *Hartman v. W.H. Odell and Associates, Inc.*, 117 N.C. App. 307, 313, 450 S.E.2d 912, 917 (1994). As noted above, the clients for whom Slayton is currently drilling have no possible connection to Landmarc.

CEC's own non-compete covenant provides four different, progressively more limited definitions for "restricted territory" in the event that the "United States" is deemed unreasonable or otherwise invalid or unenforceable. Complaint [Doc.1] Ex. 1 p. 6. CEC's proposal of several less restrictive (but still overly broad) geographic limits is a tacit admission that the nationwide limitation is unreasonable on its face. With the exception of the most restrictive (fifty state) geographical restriction, Plaintiff has not and cannot offer any evidence that Slayton violated the non-compete.

10

An application of the six factors reveals that the restrictive covenant is invalid and unenforceable. First, CEC seeks to restrict Sean Slayton from working for any competitor throughout the entire United States. Complaint [Doc.1] Ex. 1 p. 6. The geographic area is not limited to locations where Sean Slayton actually performed services for CEC or clients with whom CEC can demonstrate actual competition. In fact, in its Complaint, CEC alleges that Sean Slayton performed services in 23 states and Puerto Rico. *Id.* ¶ 29. Slayton contends that he worked in just 14 states. *See* Slayton Aff. ¶ 22. Notwithstanding the same, CEC attempts to prevent him from working every state, increasing the area where he is not permitted to work to anywhere from double to more than three times the area in which he actually performed services for CEC and with clients for which Plaintiff does not and cannot compete. North Carolina law is clear that where a non-compete extends to areas where an employee had no business dealings for the employer, the territorial restriction is overbroad and unenforceable. *See, e.g.*, *Hejl*, 196 N.C. App. at 307, 674 S.E.2d at 430. Here, Plaintiff seeks to extend to territories beyond Slayton's experience and with clients beyond its experience.

Similarly, in its Complaint, CEC alleges that it "provided landfill gas construction services to 39 states" in 2015 and 2016. *Id.* ¶ 29. Nonethelesss, CEC attempts to restrict Sean Slayton from employment with any competitor in an area 25% larger than CEC's claimed operational area. Plaintiff's allegation that it "provided" services in 39 states is called into question by its discovery responses, served on September 12, 2017. Carlson RFP No. 1, p. 28. Because Landmarc does not have a contract with Waste Management, and is not performing work for Waste Management pursuant to any such contract, there is no risk that Slayton's employment with Landmarc will impact CEC's rights. Thus, even a 39 state restriction would be overbroad here.

11

Finally, Slayton performs landfill drilling work, drilling holes in locations designated by engineers. *See* Landmarc Aff. ¶ 10. Slayton has been performing this work for 18 years, and any skills or knowledge he has about drilling he had prior to his employment with CEC. He is a good employee and a hard worker, but his skillset does not influence a company's ability to get work. *See* Landmarc Aff. ¶ 11. Slayton's job is not to obtain new work for Landmarc. He is drilling under a contract with terms and prices that were negotiated by Landmarc and Republic while he still worked for CEC. As such, his employment cannot be "unfair" and does not put at risk any "confidential information" about CEC's business or industry. The work was already awarded to Landmarc before Slayton was even hired by Landmarc.

The time limitation in the non-compete covenant is also overly broad and invalid, particularly when coupled with the expansive geographic restriction. The geographic restriction, regardless of whether actual competition for work exists, was designed to punish Slayton and limit competition, not to protect any legitimate business interest. Its effect would be to keep Slayton from doing the only job he has done for 18 years, anywhere in the United States for two years. The geographic territory and the time limitation are far greater than necessary to protect CEC's legitimate business interest, and is therefore unenforceable.

### 3. The covenant is otherwise overbroad.

Restrictive covenants that effectively prohibit all employment or association with an employer's competitor are invalid. *See VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508, 606 S.E.2d 359, 362 (2004) (holding as unenforceable a non-compete covenant preventing the employee from doing unrelated work at a competitor's firm or "indirectly" owning an interest in a competitor's firm). In *VisionAIR*, the North Carolina Court of Appeals reviewed the enforceability of a non-compete covenant that prohibited an employee from "'selling or

12

developing software products which will directly or indirectly compete with any of the Employer's software products' or from 'owning, managing, being employed by, or otherwise participating in, directly or indirectly, any business similar to Employer's' within the Southeast." Id. at 506, 606 S.E.2d at 361. The court concluded that "[s]uch vast restrictions on [the employee] cannot be enforced." *Id*.

Here, the non-compete covenant is too broad to be enforceable. The non-compete covenant provides that Sean Slayton shall not "develop, market, solicit, sell, or otherwise provide or perform services identical to those services that Employee developed, marketed, solicited, sold, provided or performed while employed with Employer." Complaint [Doc. 1], Ex. 1 p. 5. Like the non-compete in *VisionAIR*, the non-compete would prevent Defendant from, for example, selling services identical to those he performed for CEC. This restriction prevents Slayton from performing unrelated work. The non-compete is thus invalid under *VisionAIR*. *VisionAIR, Inc.*, 167 N.C. App. at 509, 606 S.E.2d at 363.

### 4. The Covenant Not to Compete Was Not Part of Slayton's Employment Agreement and Was Not Based on Valuable Consideration.

The covenant CEC seeks to enforce was neither part of Slayton's employment contract nor based on valuable consideration. In North Carolina, a covenant not to compete signed after the employment relationship was already in place is not enforceable without new or additional consideration.

Indeed, in *James C. Green Co. v. Kelley*, 261 N.C. 166, 168, 134 S.E.2d 166, 167 (1964), the Supreme Court of North Carolina declined to enforce a non-compete entered into approximately one year after the employer-employee relationship began, as the written contract the employer attempted to enforce did not change the employee's employment status and was not

13

supported by consideration. The *Kelley* court expressly held that "when the relationship of employer and employee is already established without a restrictive covenant, any agreement thereafter not to compete must be in the nature of a new contract based upon new consideration." *Id.*

Here, all of the evidence demonstrates that from "July, 2015, through his termination of December 14, 2016, Sean Slayton served as a Drilling Superintendent/Supervisor for CEC." *See* Affidavit of Kristofer Carlson, P.E. [Doc. 16-5] ¶ 20. Yet, the Confidentiality and Noncompetition Agreement, the agreement CEC seeks to enforce, was not executed until November 19, 2015, four months after Slayton began his employment with CEC. *See Id.*, Ex. 1.

Sean Slayton did not receive a bonus, a raise, a new title, new responsibilities, or any other consideration for his execution of the Confidentiality and Noncompetition Agreement on November 19, 2015. *See* Slayton Aff. ¶ 12. Rather, Slayton received his first paycheck from CEC on July 24, 2015, for the pay period beginning July 11, 2015, and every paycheck he received thereafter in 2015 reflected his existing salary, with no bonus, raise, or other compensation. *See* Slayton Aff. ¶ 12 and Ex. A.

Likewise, Slayton was not an owner of QDS, and received none of the proceeds from the sale of its assets to CEC. *See* Slayton Aff. ¶ 11. No additional consideration was paid to support the November 19, 2015 Confidentiality and Noncompetition Agreement, making it unenforceable as a matter of law.

### C. CEC Can Show No Irreparable Harm.

Under the hardship balancing test, the likelihood of irreparable harm to the Plaintiff if denied and the likelihood of harm to the defendant if granted are the most important factors for this Court's consideration. *Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir.1997). Here, Plaintiff

14

cannot show that it will suffer irreparable harm if Slayton is allowed to keep working under a contract Landmarc had in place before Slayton's employment began. CEC's delay in seeking this injunction evidences the absence of irreparable harm.

### 1. Plaintiff Cannot Show Irreparable Harm.

CEC first learned that Slayton was drilling more than seven months ago, as demonstrated by its January 27, 2017 cease and desist letter. *See* Complaint [Doc. 1] Ex. 3. CEC then waited until March 22, 2017, before filing the instant action. *Id.* CEC has not served any written discovery on Slayton, and has not attempted to schedule a single deposition during the five months this action has been pending. Instead, on April 19, 2017, CEC hired a private investigator to sneak onto private property and spy on Slayton. Declaration of Richard Travelstead [Doc. 16-9] ¶ 3. Then, on July 5, 2017, CEC delivered a subpoena for production of documents, dated June 28, 2017 to Landmarc. Memorandum [Doc. 17] p. 8. CEC has done nothing to employ the adequate and available legal remedies associated with discovery, mediation, and dispositive motions. Moreover, CEC waited until August 31, 2017, more than seven months after sending Slayton the cease and desist letter, before requesting injunctive relief to remedy its alleged irreparable harm. CEC's actions belie its unsupported assertions of irreparable harm.

CEC contends that it has "lost an unprecedented number of bids to Landmarc, its relationships with crucial customers Republic and Waste Management have been impaired and its capacity to compete has been harmed in ways from which it *might* not recover." Memorandum [Doc. 17] p. 18 (emphasis added). The evidence, however, is contrary to CEC's assertions and speculation. In all of its affidavits and evidence produced, CEC has only identified three jobs it allegedly lost to Landmarc: Hickory Hill and Oakridge in South Carolina and Arbor Hills. *See* Nunes Aff. ¶ 5. CEC further states that it "lost the Arbor Hills project to Landmarc

15

specifically due to lower bid prices by Landmarc." *Id.* Landmarc was not awarded the contract for these projects, BEL Engineering was. *See* Landmarc Aff. ¶ 16. BEL Engineering was, thus, the prime contractor for all of the jobs, cited by plaintiff. None of those jobs involve a contract between Waste Management and Landmarc or Republic and Landmarc. More importantly, CEC stopped contracting with BEL prior to Slayton's termination. *See* Slayton Aff. ¶ 14. Slayton did not solicit work from BEL Engineering, and has not shared any pricing information with Landmarc. Slayton Aff. ¶ 31, 32.

Although, CEC states in its Memorandum that its relationship with Waste Management has been impaired, CEC has not offered any evidence to support this contention. [Doc. 16] The only assertion regarding Waste Management offered in any of CEC's evidence is the reference that Waste Management is one of CEC's most important clients. CEC has presented no evidence that Slayton previously preformed work for Waste Management, currently performs work for Waste Management, has had any contact with anyone from Waste Management, or otherwise solicited its work.

With regard to Republic Services, the undisputable evidence demonstrates that Slayton is performing drilling work for Landmarc pursuant to a contract that was negotiated and awarded to Landmarc by Republic Services before Slayton's employment began, based on pricing that was negotiated and agreed upon while Slayton was employed by CEC. *See* Landmarc Aff. ¶ 5. CEC has presented no evidence that Slayton had any direct contact with anyone from Republic Services when he worked for CEC, that he has any direct contact with anyone from Republic Services now, that he has solicited work directly from Republic Services, or that he otherwise interfered in any way with CEC's relationship with Republic Services.

16

Not only are CEC's assertions contradicted by the evidence, but even if CEC were able to show it lost any work because of Slayton's conduct, "it is axiomatic that purely economic injury, such as that resulting from lost sales, profits or market share, does not constitute irreparable harm sufficient to warrant injunctive relief." *Southtech Orthopedics v. Dingus*, 428 F. Supp. 2d 410, 418 (M.D.N.C. 2014). "North Carolina courts routinely recognize monetary damages measured by lost profits as adequate to redress a breach of a covenant not to compete." *Id.* CEC has alleged nothing more than lost profits to support its claim it has been harmed by Slayton's activities, and CEC, an expert in its field, can easily establish what profits it would have earned from any job it allegedly lost.

The harm demonstrated by the Plaintiff must be "'neither remote nor speculative, but actual and imminent.'" *Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir.1997). CEC has not articulated any actual or imminent harm it will suffer if Slayton is allowed to keep working. By its own allegation, CEC can only claim that it "might" not recover from the claimed harm. Memorandum [Doc. 17] p. 18.

## 2. Plaintiff Cannot Show Any Harm.

Plaintiff, through its brief, seeks to demonstrate irreparable harm that warrants a preliminary injunction. However, review of Plaintiff's discovery responses and, indeed, its own brief, reveals that no harm has befallen CEC as a result of Slayton's departure. In response to discovery, Plaintiff has now produced documentation that demonstrates, as early as July, 2016, that CEC had lost $290,000 on drilling in 2016 alone. Carlson RPD. No. 17, p. 51. In its brief, Plaintiff contends that Slayton was fired due to what Plaintiff contends was "job-related misconduct and failure to operate CEC's drilling business in an acceptable manner." Memorandum [Doc 17] p. 6. Through discovery Plaintiff now contends that it is harmed

17

because it cannot hold Slayton out as a qualified driller when submitting bids to potential clients. Carlson Interrogs. No. 1. If CEC has been harmed at all, the harm was caused by CEC's termination of Slayton, not anything Slayton did post-termination. In addition to firing Slayton, Plaintiff seeks to punish him and prevent him from working anywhere. Plaintiff would have the Court believe that it fired a subpar employee who was costing CEC money and reputation, but that that employee's subsequent employment with a competitor is somehow bad for CEC. Such an argument defies logic and fails to establish any harm, let alone irreparable harm.

This, coupled with its significant delay in seeking this relief, strongly weigh against an injunction.

### D.  Slayton Will Suffer Irreparable Harm If He Is Unable to Work and a Balancing of the Equities Likewise Supports Slayton.

CEC cannot establish any irreparable harm justifying a preliminary injunction; however, Slayton will be unable to earn a living wage if he is enjoined from operating a drill rig. Slayton began his career immediately after high school, shoveling hazardous materials from environmental clean up sites. *See* Slayton Aff. ¶ 2. While working for his first employer, he gradually transitioned from that position to one as a driller. *Id.* ¶ 4. Slayton has no college degree, other special training, or any other employment experience.

For the last 18 years, Slayton has earned his livelihood by performing landfill drilling work. He was skilled in this field long before he began his employment with CEC, and he has no other skills or experience that would enable him to transition to another field. If he is restrained from working for two years, the harm to him, and his family, will be real and immediate.

CEC alleges that a balancing of the equities favors CEC because Slayton "cannot be harmed by being required to do what he already agreed to do." *See* Memorandum [Doc. 17] p. 1.

However, the Fourth Circuit has specifically rejected such an argument, holding that if courts give weight to self-created harm, as argued by CEC, "then the balance of the harms will almost always favor Plaintiff, thus transforming a preliminary injunction from an extraordinary remedy into a routine occurrence." *See Maaco Franchising, LLC v. Ghirimoldi*, 3:15-CV-99, 2015 WL 4557382 at *2 (W.D.N.C. July 28, 2015) (citing *Scotts, Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 1995)); *see also Prosperity Sys., Inc. v. Ali*, 2010 WL 5174939, at *5 (D. Md. Dec. 15, 2010) ("The Fourth Circuit, however, bars a court from giving "short shrift" to the harm a defendant might suffer merely because it is self-inflicted."). It is without question that Slayton will suffer irreparable harm if he is enjoined from operating a drill rig at any landfill in the United States for a period of two years.

### E. CEC's Non-Compete Covenant Offends Public Policy and Violates the Public Interest.

Finally, CEC's non-compete provision violates public policy. When determining whether a restrictive covenant violates public policy, this Court should consider whether CEC's desire to protect itself from unfair competition results in an undue hardship on the employees. *Phelps Staffing*, 226 N.C. App. at 510, 740 S.E.2d at 927. In this case, enforcement of the non-compete provision would effectively prevent Sean Slayton from being directly or indirectly affiliated with, directly or indirectly owning an interest in, or working in any capacity for any company that competes with CEC throughout the entire United States.

CEC admits that its objective is "to limit CEC's competitors' ability to effectively compete on these projects." *See* Complaint [Doc. 1] ¶ 13. North Carolina law is clear that a covenant not to compete that stifles normal business violates public policy:

> Our Supreme Court has said that when the effect of a contract "is merely to stifle normal competition, it is ... offensive to public

19

> policy ... in promoting monopoly at the public expense and is bad."
> *Kadis v. Britt*, 224 N.C. 154, 159, 29 S.E.2d 543, 546 (1944). In
> such a case, the public has a greater interest in preserving an
> individual's ability to earn a living than in protecting an employer
> from competition. *Id.* at 160, 29 S.E.2d at 546.

*See Starkings Court Reporting Services, Inc. v. Collins*, 67 N.C. App. 540, 542, 313 S.E.2d 614, 616 (1984). CEC's stated efforts to stifle normal competition directly violate public policy.

The public's interest in preserving an individual's ability to earn a living outweighs the employer's protection from competition "[w]hen the contract is defective ... because its practical effect is merely to stifle normal competition ..." *Electrical South, Inc. v. Lewis*, 96 N.C. App. 160, 165, 385 S.E.2d 352 (1989) (citations omitted) (reasoning that two-year non-compete preventing association with any employer who competes with plaintiff in a 200-mile locale "produces oppressive results, which violate both the Plaintiff's and Employee's interest in his earning a living."). Here, the absence of any evidence of harm to CEC, coupled with CEC's efforts to prevent Slayton from working in at least 27 states in which he performed no work for CEC, makes clear that the effect of the non-compete is merely to stifle normal competition, and to put Slayton out of work.

## CONCLUSION

Based on the foregoing, Defendant Sean Slayton respectfully requests that this Court deny Plaintiff's Motion for Preliminary Injunction.

This the 14th day of September, 2017.

TEAGUE, CAMPBELL, DENNIS & GORHAM, L.L.P.

BY: /s/ William A. Bulfer
       Mindy C. Wudarsky
       State Bar No. 43784
       William A. Bulfer
       State Bar No. 31424
       Attorneys for Defendant
       22 South Pack Square, Suite 800
       Asheville, NC  28801
       Telephone: (828) 254-4515
       Facsimile: (828) 254-1516

21

## <u>CERTIFICATE OF WORD COUNT</u>

The undersigned certifies, pursuant to Section 3(b)(iv) of the Initial Scheduling Order issued pursuant to the Standing Order Governing Civil Case Management Before the Honorable Frank D. Whitney, Misc. No. 3;07-MC-47 (Doc. No. 2), and in reliance upon the word count of the word-processing system used to prepare the foregoing Memorandum, that the foregoing Memorandum complies with the Order and does not exceed 6,000 words, including headings, footnotes, quotations and citations, but exclusive of the case caption, any table of contents, table of authorities, and certificates of counsel.

This the 14th day of September, 2017.

TEAGUE CAMPBELL DENNIS & GORHAM, LLP

BY: __/s/ William A. Bulfer_____
William A. Bulfer

22

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 14, 2017 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

G. Bryan Adams, III
Van Hoy, Reutlinger, Adams & Dunn, PLLC
737 East Boulevard
Charlotte, NC 28203

This 14th day of September, 2017.

TEAGUE, CAMPBELL, DENNIS & GORHAM, L.L.P.

BY: /s/ William A. Bulfer
        William A. Bulfer