| | |
|---|---|
| CARLSON ENVIRONMENTAL CONSULTANTS, PC,      ) | |
| ) | |
| Plaintiff,      ) | |
| ) | **ORDER** |
| vs.      ) | and |
| ) | **PRELIMINARY INJUNCTION** |
| SEAN SLAYTON,      ) | |
| ) | |
| Defendant.      ) | |
| ) | |

THIS MATTER is before the Court on the Motion for Preliminary Injunction (Doc. No. 16) filed by Plaintiff Carlson Environmental Consultants, PC ("CEC") pursuant to Federal Rule of Civil Procedure 65(a) to preliminarily enjoin its former employee, Defendant Sean Slayton ("Slayton") from competing with it, from soliciting its customers and employees, and from using or disclosing its confidential information and trade secrets. On September 15, 2017, the Court held a hearing for the presentation of arguments and evidence by the parties. The Court issued an oral ruling that it would GRANT the motion, with a written order to follow. The Court has reviewed the pleadings, exhibits thereto, argument and evidence presented during the hearing, and applicable law. The Court also considered the competing proposed orders submitted by each party. For the reasons set forth herein, CEC's motion for preliminary injunction will be granted as follows:

## I. FINDINGS OF FACT

The Court finds the following facts based upon the affidavits submitted by the parties and evidence presented at the hearing in this matter. The Court notes these findings of fact are based on the limited record before the Court during these preliminary injunction proceedings.

Accordingly, while these findings of fact are the basis for issuance of this preliminary injunction, the Court notes these findings may change through the course of litigation based on evidence presented to the Court in any motion for summary judgment and/or trial.

CEC was founded in 2004, and provides specialty engineering, operations and maintenance, and construction services to the solid waste industry across the United States. One of CEC's unique services is landfill gas construction, which consists of both well drilling and pipeline construction and installation. Kristofer Carlson is CEC's President, Seth Nunes is CEC's Vice President, Brent Ross is a Project Director and Thomas Lafollette is a Landfill Gas Pipeline Supervisor. Each has submitted an affidavit in support of this Motion. Carlson Aff., ¶¶2-3.

One of the key services CEC provides is landfill gas well drilling, which is a highly specialized and complex service involving the use of special drilling equipment to drill holes in landfills and to then construct wells and related pipelines designed to extract the methane gas resulting from the natural decomposition of the landfill's contents. CEC has focused almost entirely on these segments of the solid waste market to grow its business. Id. at ¶4.

CEC works on landfill gas well drilling projects throughout the United States for a number of companies. CEC's two most important clients for which it has provided landfill gas well drilling services are Waste Management, Inc. and Republic Waste Services, Inc., which are national owners/operators of landfills across the United States. Due to its long association with these clients, CEC is extremely familiar with their construction requirements, safety requirements, their project operations and personnel, and other expectations on these projects. Id. at ¶5; See Nunes Aff., ¶3.

Landmarc Environmental Systems ("Landmarc") is one of CEC's primary competitors in the landfill gas construction business. CEC and Landmarc have submitted competing bids on

landfill gas projects across the United States. On a number of recent projects in 2017, CEC has lost business to Landmarc. Id. at ¶6; See Nunes Aff. at ¶¶4-6.

Prior to November 19, 2015, Defendant Sean Slayton ("Slayton") was a key principal and driller of Quality Drilling Services, LLP ("QDS"), an Ohio limited liability partnership with an office and principal place of business in Alton, Illinois, which provided landfill gas well drilling services across the United States. CEC and QDS frequently served as contractors on the same landfill gas well drilling projects, with CEC serving as the prime contractor and QDS performing the well drilling as a subcontractor. CEC purchased its own drilling equipment in May 2014. CEC had provided landfill gas construction services (pipeline installation and drilling) on projects in multiple states. CEC's competitors also frequently hired QDS for landfill gas well drilling on projects that CEC had bid on. Carlson Aff., ¶7.

In the summer of 2015, with the volume of drilling work exceeding the capacity of CEC's existing drill rig and CEC utilizing drilling subcontractors such as QDS on a frequent basis, CEC concluded that it needed to become more competitive. CEC decided to increase its drilling capabilities by purchasing the assets of QDS, which included a drill rig and related tools, client contacts, client information, goodwill, bidding information, and other proprietary data. One of the other objectives of this plan was to limit CEC's competitors' ability to effectively compete on these projects by having QDS work exclusively through CEC. CEC's principals believed that this plan would put it in a position to obtain more business from Republic Waste Services, Waste Management and other companies putting these projects out for bid. Id. at ¶8.

In June 2015, QDS and CEC held initial discussions regarding the terms of CEC's purchase of the assets of QDS. The parties' June 5, 2015 Business Plan and Agenda provides that the key objectives of the QDS purchase are to expand its drilling capabilities, to grow its drilling business

by expanding to 5 or 6 crews, for Slayton to manage this business line, to use Slayton's knowledge and experience to more effectively compete against CEC's major competitors, which included Landmarc Environmental Systems, LLC ("Landmarc"), to add more clients by purchasing QDS's client base and to utilize Sean Slayton's extensive client and industry contacts.  Carlson Supp. Aff. ¶6 and Exh. 4 (Business Plan and Agenda). The June 25, 2015 Memorandum of Understanding ("MOU") provides that Slayton will be required to enter into a five-year non-compete agreement and he would be responsible for managing CEC's drilling operations.  Id. at ¶3 and Exh. 1 (MOU). CEC subsequently reduced the five-year term of the non-compete agreement to two years at Slayton's request.  Id. at ¶6.

On or about July 20, 2015, CEC and Slayton entered into a "Short Term Employment Agreement"[1] pursuant to which Slayton would become employed for a fixed duration, which would expire at the time of the closing of the QDS transaction, at which time Slayton would be required to enter into new employment with CEC memorialized by a written employment agreement containing a covenant not to compete, customer and employee nonsolicitation provisions and a confidential information nondisclosure provision.  Carlson Supp. Aff. ¶¶3, 4 and Exhs. 2 (Short Term Employment Agreement) and 3 (November 19, 2015 Offer of At-Will Employment).

On November 19, 2015, CEC purchased the assets of QDS.  Slayton was required to enter into a Confidentiality and Noncompetition Agreement ("Agreement") with CEC as a specific term and condition of the foregoing transaction and as a prerequisite to his later becoming a CEC employee. Slayton's Agreement contained a confidential information non-disclosure provision, a

---

[1] While the Short Term Employment Agreement was not signed by Slayton, it memorialized the terms and conditions of Slayton's employment prior to the QDS closing. Carlson Supp. Aff. ¶3.

covenant not to compete, non-solicitation provisions applicable to customers, employees and suppliers. Carlson Aff. ¶¶9-18 and Exh 1 (Agreement).

In exchange for signing the Agreement, Slayton received new employment with CEC, as his short term employment had expired, as well as various benefits for which he was not previously eligible, including the CEC bonus pool, PTO and sick days, and CEC paid for his company truck and computer. Carlson Supp. Aff. ¶4 and Exh. 3. The Agreement recites that it is being entered into "in consideration of Employer's hiring of Employee as an at-will employee and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged." Carlson Aff. Exh. 1 (CEC Agreement) at p. 1.

CEC required Slayton to sign the Agreement to protect its valuable client relationships, goodwill and CEC's confidential information to which Slayton would have access by virtue of his position at CEC. Carlson Aff. ¶10. Since 2004, CEC has expended substantial resources developing its business relationships, in establishing goodwill and obtaining a national reputation as a provider of landfill gas well drilling services. Id. CEC is an expert in its field and has developed pricing and bidding processes which give it a competitive advantage in the industry. Id. Slayton acknowledged the above when he signed his CEC Agreement and thereafter took advantage of his access to CEC's confidential information which he gained access to only after signing the CEC Agreement. Id.

Slayton's Agreement contains a covenant not to compete which provides that during the Restricted Period of two (2) years following his separation from employment with CEC, within the Restricted Territory, Slayton:

    (1)    [. . . ] shall not develop, market, solicit, sell, or otherwise provide or perform services identical to those services that Employee developed, marketed, solicited, sold, provided or performed while employed with Employer; [or]

(2)      [. . .] shall not become employed by (as an officer, director, employee, consultant or otherwise), or otherwise become commercially interested in or affiliated with (whether through direct, indirect, actual or beneficial ownership or through a financial interest), a Competitor, unless Employee accepts employment with a Competitor in an area of the Competitor's business which does not compete with the Employer.

Carlson Aff., ¶14, and Exh. 1, Sec. 4.c.

In recognition of the nationwide basis of CEC's business and Slayton's involvement on a nationwide basis in the core activities of CEC's Business and the ease of competing with that Business in any part of the United States, the Agreement's Restricted Territory is defined as the United States. Id. at ¶15 and Exh. 1, Sec. 4.d. The territorial restriction also includes a number of successively smaller areas in which Slayton's competition against CEC is prohibited in the event that a court deems the nationwide territory to be unreasonable or otherwise invalid or unenforceable. Id.

Slayton also agreed not to solicit CEC employees or suppliers for a two-year period following cessation of his employment. Id. at ¶¶16-17 and Exh.1, Secs. 4.e, 5.

Throughout his CEC employment, Slayton served as a Drilling Superintendent/Supervisor where he oversaw CEC's drilling operations. Carlson Aff., ¶20; Carlson Supp. Aff., ¶11 and Exh. 11 (job description); See Motion for Preliminary Injunction, Exh. 3 (Slayton's Landmarc personnel file) at LES 0046 (Landmarc Employment Application)(filed under seal). Slayton was the client contact for multiple CEC clients, and was the point of contact when he was in the field at any landfill facility. Id. Slayton managed 3 CEC drillers and up to 12 employees. Id. Slayton was directly involved in CEC's pricing process and in formulating and submitting CEC's drilling proposals and bids. Id.; Carlson Supp. Aff., ¶8 and Exhs. 6-9 (bid proposals prepared and signed by Slayton); Cf. Slayton Aff., ¶¶17-18. Slayton negotiated pricing directly with CEC's customers. Carlson Supp. Aff., ¶9. Accordingly, Slayton had access to highly confidential pricing information

and knew CEC's unique and proprietary method of creating proposals and bids, which provides CEC with a competitive advantage over its competitors like Landmarc. Id. Slayton was in charge of hiring and drill crew set-up and had direct knowledge of employee salaries and bonuses at CEC, thus making his employee non-solicitation provision particularly important, because he possessed information that could enable him to lure employees away were he to join a competitor. Carlson Aff., ¶20; Carlson Supp. Aff., ¶10 and Exh. 10 (Vince Coleman email regarding Chas Slayton's employment with Landmarc on "Sean Slayton's crew").

Slayton was also a CEC client liaison, which enabled him to have personal contact and develop relationships with CEC's existing and potential clients and to learn valuable insight regarding their business opportunities, needs and requirements and the key contacts within each. Carlson Aff., ¶21. The nature of Slayton's position and his supervision of drillers and other CEC employees provided him with high-level knowledge about CEC's operations which gave CEC a competitive edge against its competitors. Id.; See Motion for Preliminary Injunction, Exh. 3 at LES 0046.

From July 15, 2015 through November 30, 2016, Sean Slayton performed his duties for CEC on 68 projects in multiple cities in the following states: Colorado, South Carolina, Indiana, Georgia, North Carolina, Kentucky, Kansas, Louisiana, Michigan, Alabama, Florida, Texas, Missouri, Tennessee, Minnesota, Arkansas, and West Virginia. Carlson Supp. Aff., ¶7 and Exh. 5 (CEC 2015-2016 Drilling Revenues spreadsheet); Carlson Aff., ¶22. Due to the nationwide scope of CEC's business, Slayton was subject to being required to perform his duties for CEC in other states across the country where CEC might have projects.

In 2016 and 2017, CEC bid on landfill gas well drilling projects across the United States, from the Pacific Northwest, to Texas, to New England and all areas in between. Carlson Aff. ¶¶23,

26. In 2015 and 2016, CEC provided landfill gas construction services in 39 states ranging from Maine to Colorado. Id. Slayton was directly involved in preparing the bids for these projects using his knowledge of CEC's Confidential Information, including pricing and its bid formulation method. Id. at ¶¶23, 26; Carlson Supp. Aff., ¶8 and Exhs. 6-9.

In 2016, CEC entered into an agreement with Landmarc to lease and then purchase a drill in exchange for Landmarc's agreement to hire CEC for as many drilling jobs as CEC had the resources to handle. It was expected that Landmarc had sufficient new and recurring business over the next 2 to 3 years to provide CEC with a substantial amount of drilling work. Id. at ¶24. Landmarc informed CEC's principals that this lease-purchase arrangement was part of its overall strategy to get out of the landfill gas well drilling business. Id. at ¶25.

Also in 2016, Landmarc and CEC bid on many of the same landfill gas well drilling projects throughout Texas, Michigan, Ohio, Arkansas, Tennessee, Kentucky, and Alabama. Carlson Aff. ¶26.

On December 14, 2016, CEC terminated Slayton's employment due to job-related misconduct and failure to operate CEC's drilling business in an acceptable manner. Carlson Aff., ¶27 and Exh. 2 (termination letter).

On January 10, 2017, Slayton became employed with Landmarc as a Drilling Superintendent. Mot. for Prelim. Inj., Exh. 3 at LES 0001-0006 (filed under seal). Slayton's responsibilities included growing Landmarc's gas construction drilling business, training and supervising drilling crews and meeting with and updating clients. Id.; See, Id. at LES 0049-0050. In executing his Landmarc offer letter, Slayton denied that he was bound by an agreement not to compete which would preclude his employment with Landmarc. Id. at LES 0004 (filed under seal).

Slayton also agreed to a covenant not to compete with Landmarc. Id. at LES 0005 (filed under seal).

On January 27, 2017, CEC sent Slayon and Landmarc a cease and desist letter upon learning he was employed by Landmarc and enclosed a copy of Slayton's CEC Agreement. Id. at ¶32; See Complaint (Doc. 1), Exh. 3 (letter).

On March 22, 2017, CEC filed this lawsuit against Slayton asserting claims for breach of his CEC Agreement and specifically the Noncompetition Covenant and Nonsolicitation provisions, tortious interference with existing and prospective business relations and unfair and deceptive trade practices. See Complaint (Doc. 1); Carlson Aff., ¶33.

On March 28, 2017, Landmarc issued a letter to Slayton directing him not to engage in certain activities that would violate his post-employment obligations to CEC under his Agreement. Mot. for Prelim. Inj., Exh. 3 at LES 0051 (filed under seal). With regard to his Noncompetition provision, the letter provides that Slayton is not permitted to perform the same work he had performed for CEC for "non-Landmarc customers." Id. This directive is inconsistent with Slayton's Noncompetition provision in his CEC Agreement. Slayton's own filings in opposition to CEC's motion reflect that he has performed landfill gas well drilling services for at least two of CEC's customers. See Ma Aff., ¶3 (chart).

On April 17, 2017, Slayton brought a Motion to Dismiss (Doc. 4), contending that Slayton's Confidentiality and Noncompetition Agreement was overly broad and unenforceable. On May 9, 2017, CEC filed its Response in Opposition to Slayton's motion (Doc. 15). The Court denied Slayton's Motion to Dismiss on May 11, 2017.

Since becoming employed by Landmarc, Slayton has performed the same services he provided to CEC. Carlson Aff., ¶¶29, 42-43. Slayton has supervised employees who perform

landfill gas well drilling, he has consulted and provided technical assistance to those employees and he has personally operated drills on landfill gas well drilling projects for Landmarc in several states. Mot. for Prelim. Inj., Exh. 4; <u>See</u> Thomas Lafollette Aff., ¶¶3-4; Brent Ross Aff., ¶¶3-5. Slayton has performed landfill gas well drilling services for Landmarc, at a minimum, in the states of Kentucky, Indiana, Missouri, and Oklahoma. <u>Id.</u> In April 2017, a private investigator engaged by CEC observed Slayton with Landmarc employees at the site of a landfill project in Kentucky. Carlson Aff., ¶36; <u>See</u> Declaration of Richard Travelstead. In June 2016, Slayton provided off-site technical support and supervision to drilling employees in a Landmarc project in South Carolina. Brent Ross Aff., ¶¶3-5. Also in June 2016, CEC Landfill Gas Pipeline Supervisor Thomas Lafollette observed Sean Slayton operating a landfill gas well drill for Landmarc at the Green Valley landfill (owned by Republic Waste Services, Inc.) in Kentucky. <u>See</u> Thomas Lafollette Aff. ¶¶3-4.

Since Slayton became employed with Landmarc, several of CEC's critical customer relationships have been impaired. For example, CEC does not receive the drilling work from customers BEL Engineering, SCS Field Services and Enerdyne Power Systems, Inc. that it received before Slayton became employed at Landmarc Carlson Aff., ¶31. CEC no longer receives work from BEL Engineering and Advanced One. Nunes Aff., ¶6. BEL Engineering now uses Landmarc for its drilling work instead of CEC. Carlson Aff., ¶31.

CEC's competitive position with major clients such as Waste Management Services, Inc. and Republic Services, Inc. has also been diminished since Slayton became employed with Landmarc. Nunes Aff., ¶3. There are many landfills with recurring gas well drilling projects that CEC had worked on before Slayton joined Landmarc. <u>Id.</u> However, since January 2017, CEC's work at these sites has declined substantially, and CEC has submitted bids in competition with

Landmarc for additional work at these sites and, for the first time, CEC has been losing out to Landmarc. Id. The degree to which CEC has experienced this since January, 2017, is unprecedented. Id.

Landmarc has been able to obtain landfill gas well drilling work on at least 11 projects where CEC had previously performed that same work either exclusively or through Landmarc. Nunes Aff., ¶¶4-5. CEC is not performing any of the landfill gas well drilling work at these 11 landfills. Id. Prior to January 2017, Landmarc was not generally successful in outbidding CEC for these projects. Id. CEC contends that Sean Slayton, who was directly involved in formulating and pricing bids for CEC, is divulging CEC's confidential pricing information and unique bidding strategies to Landmarc which allows Landmarc to compete unfairly against CEC for projects. Id. As a direct result of these lost bids, CEC's 2017 revenues have declined by hundreds of thousands of dollars, and if this continues, CEC asserts that it threaten its competitive position in the landfill gas well drilling industry and damage CEC financially if this trend continues. Id. CEC has lost bids for drilling projects to Landmarc at the Hickory Hill landfill in South Carolina and the Oakridge Landfill in South Carolina. Id. CEC lost the Arbor Hills project to Landmarc specifically due to lower bid prices by Landmarc. Id. CEC lost the Hickory Hill and Oakridge projects very closely and in both instances, Landmarc was a drilling subcontractor for the project's general contractor, BEL Engineering. Id. at ¶5.

Since Slayton became employed with Landmarc, at least three former CEC employees - Josh Goosman, Charles Slayton and Austin Slayton – have become employed at Landmarc to perform drilling. Aff., ¶¶44, 46; Nunes Aff., ¶8.

Slayton recently contacted one of CEC's suppliers, Bauer-Pileco, in order to purchase or lease drilling equipment on behalf of Landmarc. Bauer-Pileco sells and leases drilling equipment

and was a supplier CEC has frequently used for this purpose. Nunes Aff., ¶7. Slayton's Agreement with CEC prohibits him from entering into any contract or business arrangement with any CEC supplier. Carlson Aff., Exh. 1 at Sec. 4.c.(3).

## II. CONCLUSIONS OF LAW

Based on these findings, the Court concludes as follows:

The requirements for obtaining a preliminary injunction in this circuit are set forth in Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365 (2008). Under Winter's balancing test, the four factors to be considered are: (1) the movant's likelihood of success on the merits; (2) the likelihood that the movant will suffer irreparable harm in the absence of preliminary injunctive relief; (3) whether the balance of equities tip in the movant's favor; and (4) the public interest. Id. The Court will now consider each of these elements in turn.

### A. LIKELIHOOD OF SUCCESS ON THE MERITS

Parties seeking a preliminary injunction must demonstrate that they are likely to succeed on the merits. Winter, 555 U.S. at 20, 129 S. Ct. at 374. This inquiry requires that the movant make a "clear showing" that he is likely to succeed at trial, though that does not require the movant to show a certainty of success. Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013). CEC is likely to succeed on the merits of its breach of contract claim, because Slayton's CEC Agreement is valid and enforceable and Slayton has violated the Agreement during his employment with Landmarc.

#### 1. Slayton's CEC Agreement

The elements for a breach of contract claim under North Carolina law are "(1) [the] existence of a valid contract and (2) breach of the terms of that contract." Samost v. Duke Univ., 742 S.E.2d 257, 260 (N.C. Ct. App. 2013). A restrictive covenant between an employer and an employee is valid and enforceable under North Carolina law if it is: "(1) in writing; (2) reasonable

as to terms, time, and territory (3) made part of the employment contract; (4) based on valuable consideration; and (5) not against public policy." Triangle Leasing Co., Inc. v. McMahon, 327 N.C. 224, 228, 393 S.E.2d 854, 857 (1990); United Labs., Inc. v. Kuykendall, 322 N.C. 643, 649-50, 370 S.E.2d 375, 380 (1988). In order for a restrictive covenant to not be against public policy, it "must be no wider in scope than is necessary" to protect the legitimate business interests of the employer. Med. Staffing Network, Inc. v. Ridgway, 194 N.C. App. 649, 656, 670 S.E.2d 321, 327 (2009). Slayton's CEC Agreement satisfies each of the criteria for an enforceable agreement as set forth below:

First, the Agreement is in writing and is part of Slayton's employment contract with CEC. See Carlson Aff., Exh. 1. Slayton does not dispute that CEC has satisfied the first and third elements of a valid noncompetition agreement. Id.

Second, the Noncompetition provision was entered into as an express condition of Slayton's employment with CEC and is therefore based on valuable consideration. See Carlson Aff., ¶9 and Exh. 1 at p. 1 ("in consideration of Employer's hiring of Employee as an at-will employee and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged . . ."); Carlson Supp. Aff., ¶¶3-5; See also, Greene Co. v. Kelley, 261 N.C. 166, 134 S.E.2d 166 (1964) ("The promise of new employment will serve as valuable consideration and support an otherwise valid covenant."). Slayton's short term employment with CEC, which began on or about July 20, 2015, expired at the time of the closing of the QDS transaction, therefore his at-will employment memorialized by the Noncompetition and Confidentiality Agreement (Carlson Aff., Exh. 1) was new employment sufficient to serve as consideration therefor. Id. Moreover, upon execution of the Agreement, Slayton also received certain employment benefits to which he was not previously entitled or eligible, such as the CEC

bonus pool, PTO and sick days and payment for his company truck and computer. Carlson Supp. Aff., ¶¶3-5.

Third, the Noncompetition provision is designed to protect CEC's legitimate business interests. See Carlson Aff., ¶10 and Exh. 1, Recitals (agreement is entered into "for the protection of Employer's Business, goodwill, trade secrets and other confidential information."). First, Slayton's Agreement recites that it is being entered into "in order to protect Employer from unfair competition, and to prevent the unauthorized disclosure or use of Employer's Confidential Information, Employee agrees . . ." Carlson Aff., ¶10 and Exh. 1, Secs. 4.a., 4.c. Slayton's duties included serving as a client liaison which resulted in frequent personal contact with CEC's clients, and it was therefore critical to protect the important customer relationships from misappropriation by Slayton. Id. at ¶¶20-21; See Kuykendall, 322 N.C. at 651, 370 S.E.2d at 381 ("protection of customer relations and goodwill against misappropriation by departing employees is well recognized as a legitimate protectable interest of the employer."); A.E.P. Indus., Inc. v. McClure, 308 N.C. 393, 408, 302 S.E.2d 754, 763 (1983). Second, Slayton agreed that CEC's business was highly competitive and involved the use of trade secrets and confidential information and that if Slayton accepted employment from a competitor, this would give the competitor an unfair advantage and would threaten the unauthorized disclosure of CEC's confidential information. Id. at ¶¶10-13 and Exh 1 at Sec. 3.a; See, e.g., Elec. S., Inc. v. Lewis, 96 N.C. App. 160, 165-66, 385 S.E.2d 352, 355-56 (1989) (confidential information and trade secrets are legitimate protectable interests). Slayton acknowledged that he would become privy to CEC's Confidential Information and that he was prohibited from misappropriating the same. Id. and Exh. 1, Sec. 3. CEC's Confidential Information includes information relating to customers' requirements, which gives it a competitive advantage. Id., ¶5. Finally, CEC has a legitimate interest in protecting its business'

goodwill, including the goodwill of QDS it purchased in November 2015. Id. at ¶¶7-9 and Exh. 1, Sec. 5 (referencing purchase of QDS's customer relationships).

Fourth, the Agreement is reasonable as to time and territory. Farr Associates, Inc. v. Baskin, 138 N.C. App. 276, 280, 530 S.E.2d 878, 881 (2000).

a.  The Nationwide Geographic Scope

CEC's nationwide geographic territory is directly related to the area where CEC conducts and is expanding its business, where it has a legitimate interest in protecting itself from unfair competition and in protecting its customer relationships and it corresponds to where Slayton performed services for it. See Carlson Aff., ¶¶2-3, 5-6, 20-22. Each of these factors favors CEC and the reasonableness of the geographic territory. See Farr Assoc., 138 N.C. App. at 281-82, 530 S.E.2d 882.

CEC provides its services and has offices "*across the United States*".  Carlson Aff., ¶¶2-3, 5-6. (Emphasis added).  CEC's two most important customers, Waste Management, Inc. and Republic Waste Services, Inc., are *national* companies that own and operate landfills across the United States. Id. at ¶5.  Before, during and after Slayton's employment, CEC has continued to expand the footprint of its business by and through these two critically important national customers Id. at ¶6 (Waste Management's "National Drilling Services Price Proposal).  Slayton acknowledged that the Restricted Territory was reasonable "[i]n recognition of the *nationwide basis* of the Employer's Business." Id. at Exh. 1, Sec. 4.d (Emphasis added).  During Slayton's employment with CEC, CEC bid on projects throughout the United States and Slayton provided landfill gas well drilling services "exclusively for CEC *all over the United States*." Id. at ¶¶22-23 (Emphasis added).

The nationwide geographic territory in Slayton's non-compete is therefore reasonable and enforceable, as it corresponds to the area in which CEC conducts its business and where its customers are located. Manpower of Guilford County, Inc. v. Hedgecock, 42 N.C. App. 515, 523, 257 S.E.2d 109, 115 (1979). Similar territorial restrictions have consistently been deemed valid and enforceable by our courts. See Agdata, LP v. Gupta, 2008 U.S. Dist. LEXIS 104264, at *5-6 (W.D.N.C. Oct. 31, 2008) (nationwide territory); Okuma America Corp. v. Bowers, 181 N.C. App. 85, 638 S.E.2d 617 (2007) (customer non-solicitation provision extending through North and South America); Cole v. Champion Enters., Inc., 305 Fed. Appx. 122, 130 (4th Cir. 2008) (3-year, nationwide non-compete).

Based on the foregoing, the territory in Slayton's CEC Agreement is reasonable.

b. The Two-Year Time Restriction

A two-year noncompetition agreement is "well within the range that the North Carolina courts have deemed reasonable." See Static Control Components, Inc. v. Darkprint Imaging, Inc., 240 F. Supp. 2d 465, 474 (M.D.N.C. 2002) (a covenant not to compete of two years is not per se unreasonable); ABT, Inc. v. Juszczyk, 2010 U.S. Dist. LEXIS 91613 (W.D.N.C. 2010) (2 year, nationwide noncompete); Kinesis Adver., Inc. v. Hill, 187 N.C. App. 1, 14, 652 S.E.2d 284, 294-95 (N.C. App. 2007) (2-year non-compete). This is particularly true in the instant case, where Slayton's non-compete arose out of the sale of a business. See Carlson Aff., ¶¶7-9; See, e.g., Jewel Box Stores Corp. v. Morrow, 272 N.C. 659, 662-63, 158 S.E.2d 840, 843-44 (1968)(citing cases enforcing noncompetes from 7 to 20 years, and enforcing Morrow's 10-year noncompete incidental to sale of business); Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 226, 333 S.E.2d 299, 304-04 (1985) (enforcing 7-year noncompete incidental to sale of business).

The two year time restriction is reasonable under the facts and authorities described above.

Finally, the Agreement is not against North Carolina public policy. North Carolina courts have held that "protection of customer relationships and goodwill against misappropriation by departing employees is well recognized as a legitimate protectable interest of the employer." See Kuykendall, 322 N.C. at 651, 370 S.E.2d at 381. The Agreement and CEC's documents relating to the QDS transaction make clear that protection of the customer relationships, goodwill and Slayton's customer contacts in the industry were key considerations in requiring Slayton to sign the Agreement as a condition of his employment. See Carlson Aff., Exh. 1 at p. 1; Carlson Supp. Aff., ¶6 and Exh. 4. The Agreement is not broader than necessary to protect CEC's valuable customer relationships and confidential information across the United States which it has cultivated and protected for over 13 years.

　　2.　Evidence of Slayton's Breach of his CEC Agreement

The Court has, in its discretion, considered the evidence CEC has presented at this preliminary stage. The Court concludes that CEC has submitted adequate proof to show that Slayton has likely violated the terms of his CEC Agreement by engaging in activities during his employment with Landmarc that violate various provisions of his Agreement, such that CEC is likely to succeed on the merits of its breach of contract claim.

First, CEC's evidence shows that Slayton is employed by Landmarc, a direct competitor of CEC as a Drilling Superintendent in the same position he held at CEC and is performing the same services by engaging in landfill gas well drilling, supervising drilling crews, having contact with customers and providing technical support to other Landmarc drillers within the nationwide Restricted Territory contained in his CEC Agreement. *See* Carlson Aff., ¶¶36-43; Mot. for Prelim. Inj. Exh. 3. While Slayton contends that he is only a driller for Landmarc and only served as a driller at CEC, documents from his Landmarc personnel file reflect that he was hired as a

Superintendent with far broader responsibilities than a mere driller, and that Slayton himself acknowledge that he had been a Manager for CEC, responsible for overseeing operations. <u>See</u> Slayton Aff., ¶¶7, 10, 28; Mot. for Prelim. Inj. Exh. 3; <u>See also</u> Lafollette Dec., ¶4; Ross Aff., ¶4; Nunes Aff., ¶¶3-6.

Second, CEC has presented circumstantial evidence that Slayton has violated the customer and employee nonsolicitation provisions of his CEC Agreement. CEC's evidence shows that, during Slayton's employment with Landmarc, former CEC employees Josh Goosman, Chas Slayton and Austin Slayton have gone to work for Landmarc as drillers. Nunes Aff., ¶8; Carlson Aff., ¶¶44, 46; *See* Lafollette Dec., ¶4. Also since Slayton has become employed by Landmarc, CEC has completely lost the business of at least two long-standing customers, BEL Engineering and Advanced One Engineering, both of whom are now hiring Landmarc and Slayton to perform landfill gas well drilling services. Nunes Aff., ¶¶3-7; Carlson Aff., ¶31. CEC has also presented evidence that, since its hiring of Slayton, Landmarc has, for the first time, been successful in obtaining business from former CEC customers with whom Landmarc had not previously performed drilling work. <u>Id.</u>

Third, CEC has presented circumstantial evidence that Slayton is using or disclosing confidential CEC priding and bidding information to enable Landmarc to be the successful bidder on projects for which CEC also submitted bid proposals. Carlson Aff., ¶¶47-48. While Slayton denies having access to CEC pricing or being involved in preparing and submitting bids, CEC has presented examples of 4 bids that Slayton prepared and signed on behalf of CEC and that Slayton directly negotiated pricing with CEC's customers. Carlson Supp. Aff., ¶¶8-9; <u>Cf.</u> Slayton Aff., ¶¶17-18. CEC's evidence also shows that it has lost a number of bids to Landmarc since Sean Slayton became its Drilling Superintendent, at least some of which were due to lower pricing. <u>Id.</u>;

Nunes Aff., ¶¶3-6. This evidence would suggest that Slayton is using or disclosing CEC's prices and or bidding information based on his knowledge of the same due to his employment at CEC.

Fourth, CEC presented evidence that Slayton has contacted at least two CEC suppliers to conduct business with them relating to drilling. Nunes Aff., ¶7. This conduct would violate Section 4.c.(3) of Slayton's CEC Agreement.

Each of these examples would constitute a breach of Slayton's Agreement.

B. <u>IRREPARABLE HARM</u>

The preliminary injunction standard "requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." <u>Winter</u>, 555 U.S. at 22, 129 S. Ct. at 374. Irreparable injury includes injury for which a monetary award would be inadequate, or for which a monetary award is incalculable. Irreparability of harm includes the impossibility of ascertaining with any accuracy the extent of the loss, for example the inability to calculate the extent of sales the plaintiff's competition will cause it to lose, and the "far- reaching, effects upon its good will. . ." <u>Blackwelder Furniture Co. v. Seilig Mfg. Co.</u>, 550 F.2d 189, 197 (4th Cir. 1977). Irreparable injury is injury that is both actual and immediate. <u>Dan River, Inc. v. Icahn</u>, 701 F.2d 278, 284 (4th Cir. 1983); <u>See</u> <u>Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.</u>, 22 F.3d 546, 551 (4th Cir. 1994) ("[I]rreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate."). "[T]he threat of . . . the potential loss of goodwill [ ] support[s] a finding of irreparable harm" in the preliminary injunction analysis. <u>Id.</u> at 552.

CEC's evidence shows that it is likely to suffer irreparable harm in the absence of injunctive relief, because if Slayton provides the services of a Drilling Superintendent with Landmarc, he will be in a position to continue to damage and threaten to damage CEC's customer

relationships, goodwill, and ability to fairly compete for landfill gas well drilling work. CEC has also presented evidence that Slayton's actions have interfered with and may in fact have permanently damaged a number of CEC's critical customer relationships and competitive position. In particular, the threat that Slayton could negatively impact CEC's ability to fairly compete for upcoming bids on national drilling projects presents a potentially devastating impact on CEC's business that could not be adequately remedied or measured with monetary damages. See Carlson Aff., ¶¶47-48; Nunes Aff., ¶¶4-10. These are not finite and isolated incidents, but are harms that will continue to occur unless Slayton is ordered to comply with his CEC Agreement. The Court finds that the potential loss of customer relationships, goodwill and impairment of CEC's competitive position support a finding that CEC is likely to suffer irreparable harm without injunctive relief. The Court also finds that Slayton recognized in his CEC Agreement that his violation of the noncompetition provisions would cause irreparable harm to CEC. Carlson Aff., Exh 1, Sec. 6.

### C. THE BALANCE OF THE EQUITIES

In order to obtain a preliminary injunction, CEC is required to demonstrate that the balance of equities tips in its favor. Winter, 555 U.S. at 20, 129 S. Ct. at 374. The evidence tips the balance in CEC's favor for the following reasons. First, CEC's evidence shows that Slayton was reminded of his contractual obligations to CEC at the time of his termination but he immediately sought employment with a direct competitor performing the same services he had performed at CEC in violation of those contractual obligations. Second, upon becoming employed with Landmarc, Slayton misrepresented that he was not bound by any covenant not to compete that would preclude his employment with Landmarc. Third, CEC sent Slayton and his employer a cease and desist letter, yet the evidence shows that before and after receipt of that letter, Slayton continued to

perform his duties as Drilling Superintendent for Landmarc in disregard of the noncompetition provision of his CEC Agreement. Fourth, Landmarc uses, and required Slayton to sign, a restrictive covenant that is very similar in effect to that which CEC seeks to enforce. See Superior Performers, Inc. v. Meaike, 2014 U.S. Dist. LEXIS 50302, * 52-53 (M.D.N.C. April 11, 2014). Fifth, on March 29, 2017, after the filing of this lawsuit, Landmarc issued a letter to Slayton directing him not to engage in certain activities; however, the letter notably ignores the most basic provision of Slayton's agreement, which prohibits his providing the same services for Landmarc that he provided to CEC. Landmarc thus ratified and is complicit in Slayton's continued violation of CEC's agreement, thus reinforcing the need for a court order enjoining Slayton and requiring his compliance with the CEC Agreement.

Slayton contends that he is only performing the role of a driller and is not performing the managerial and supervisory functions associated with a Superintendent position. Slayton Aff., ¶¶7, 10, 28. Slayton also claims that drilling is the only work he has ever performed and that enjoining him would deprive him of earning a livelihood, although, in his CEC Agreement, he agreed that complying with the noncompetition provisions of his Agreement would prevent him from finding gainful employment. Id. The Court is of the opinion that permitting Slayton to continue to perform only those functions associated with being a landfill gas well driller will not present the threat of ongoing irreparable harm to CEC that would be exist if he were allowed to perform other services such as those associated with a manager, supervisor or superintendent.

Finally, Slayton contends that he has not engaged in conduct that violates the customer and employee nonsolicitation provisions, the confidential information nondisclosure provision or the provision prohibiting him from engaging in business with CEC suppliers. The Court finds that

under these circumstances, Slayton will not be harmed by an injunction which requires him to comply with those provisions which he states that his is not violating.

Issuance of an injunction would only require Slayton to do that which he agreed to do in the CEC Agreement and would prevent him from continuing to harm CEC and its customer relationships.  See Phillips Elecs. N. Am. Corp. v. Hope, 631 F.Supp.2d 705, 709-11 (M.D.N.C. June 30, 2009). The damage that would result if Slayton were allowed to continue to violate his noncompetition agreement outweighs any harm to Slayton from enforcement of the noncompetition agreement that he agreed to abide by as a condition of his employment at CEC. Accordingly, any harm that Slayton suffers is a direct consequence of his own failure to abide by the CEC Agreement.  See Meineke Car Car Ctrs., Inc. v. Catton, 2010 U.S. Dist. LEXIS 146494, *10-11 (W.D.N.C. June 24, 2010).

D. THE PUBLIC INTEREST

Finally, CEC must demonstrate that an injunction is in the public interest.  CEC contends that the public interest is served by enforcing Slayton's Agreement, because enforcement of valid private contracts entered into knowingly and voluntarily is in the public interest.  Slayton argues that the public interest is not served because an injunction would deprive his ability to earn a living. The Court concludes that in this case, the interest in enforcing valid contracts outweighs the interest in Slayton's freedom to pursue employment in a manner that contravenes the restrictive covenant, except insofar as such employment is limited to being a landfill gas well driller.  Granting    a preliminary injunction is in the public interest, because it is beneficial to the public for Courts to enforce agreements that private parties enter into knowingly and voluntarily. See Phillips Elecs., 631 F.Supp.2d at 724 (the public interest is served by "ensuring that contracts are enforced" and preventing "unethical business behavior") (citing UBS PaineWebber, Inc. v. Aiken, 197 F. Supp.

22d 436, 448 (W.D.N.C. 2002)). CEC has a legitimate interest in developing its customer relationships and being able to share confidential information with its employees without fearing that it will end up in the hands of a competitor. Travenol Labs., Inc. v. Turner, 30 N.C. App. 686, 691, 228 S.E.2d 478, 483 (1976). Accordingly, CEC has demonstrated that injunctive relief is in the public interest and that CEC is entitled to a preliminary injunction.

## III. CONCLUSION

For the reasons discussed above, IT IS ORDERED that Plaintiff's Motion for Preliminary Injunction (Doc. No. 16) is GRANTED, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure. Specifically, IT IS ORDERED that the Defendant Sean Slayton, is immediately restrained and enjoined from the following within the Restricted Territory, defined to mean the United States, during the pendency of this action:

1.  Developing, marketing, soliciting, selling, or otherwise providing or performing services identical to those services that he developed, marketed, solicited, sold, provided or performed while employed with CEC, except that Slayton will be permitted to remain employed with Landmarc so long as he is <u>only</u> providing services of a Landfill Gas Well Driller.

    a.  As defined herein, and as set forth in the affidavit of Sean Slayton (¶21) submitted in this matter, a Landfill Gas Well Driller "simply operate[s] the drill rig to drill the hole in the location identified and to the depth instructed by the engineering firm."

    b.  A Landfill Gas Well Driller is further defined as follows: a heavy equipment operator that specializes in the operation of drill equipment such as, but not limited to, Caterpillar IMT, Soilmec SR and Bauer-Pileco Drill Rigs. A driller is a non-manager operating a drill rig. The driller is responsible for drilling a bore hole to a specified depth. Drilling activities typically occur as a part of oil & gas wellfield drilling, bridge pier drilling, water well drilling and other well drilling that would not violate the other parts of this injunction. The driller is typically managed by an onsite Drilling Manager/Drilling Superintendent or Onsite Engineer.

2.  Performing any services associated with a Drilling Manager or Drilling Superintendent, including, at a minimum, the following:

- Preparing bids, proposals, and responses to Requests for Proposal
- Coordinating with Client/Site Owner prior to mobilization
- Serving as the main point of contact to client while onsite
- Scheduling of the drill rig and drill equipment transport from landfill to landfill
- Scheduling, transporting and moving the drill rig and drill equipment from well location to well location
- Scheduling and/or attending pre-construction meetings, progress meetings and conducted other project related meetings
- Contacting vendors, clients, site owners for parts, materials, and equipment repairs/maintenance/service prior to mobilization or throughout a project
- Managing and Scheduling the drill completion team which includes heavy equipment operators and helpers for the following;
  - Supervising installation of the well casing pipe
  - Supervising installation of the well aggregate/well backfill material
  - Supervising installation of the well bore seal(s)
- Managing pad construction team which includes heavy equipment operators and helpers for the following;
  - Supervising laborers and equipment operators to build drill pads
  - Supervising or defining setup location, construction sequence, and timing prior to drilling the well
- Scheduling mechanics for routine services and repair of the drill rig
- Scheduling of rental equipment
- Contacting vendors for drill tools, drill buckets and Kelly bars
- Arranging hotel rooms and accommodations for crew on a project
- Overseeing or assist with the preparation, reviewing and signing the well drill schedule
- Completing material inventory of parts available for the project
- Managing and completing DOT paperwork for company vehicles and drivers
- Conducting any safety meetings

3. Becoming employed by (as an officer, director, employee, consultant or otherwise), or otherwise becoming commercially interested in or affiliated with (whether through direct, indirect, actual or beneficial ownership or through a financial interest), a Competitor, unless Employee accepts employment with a Competitor in an area of the Competitor's business which does not compete with the Employer, as provided in Section 4.c.(2) of Slayton's CEC Agreement, or as otherwise expressly authorized by this Order.

4. Hiring, employing, soliciting or attempting to solicit or induce any person employed with CEC, or soliciting or inducing any supplier or other contractor of CEC, to leave such employment, or to end or reduce any business relationship with CEC, or to violate any covenant not to compete, non-solicitation agreement, confidentiality agreement, nondisclosure agreement or any other restrictive covenant, employment agreement,

independent contractor agreement or other business relationship with CEC, as provided in Section 5.a of Slayton's CEC Agreement.

5. Soliciting or attempting to solicit, the business of any of CEC's Customers to whom Slayton, or anyone directly supervised by Slayton, has sold any QDS or CEC products or services while employed by QDS or CEC, regardless of where such Customer is located, as provided in Section 5.b of Slayton's CEC Agreement.

6. Using or disclosing any CEC Confidential Information (as defined in Section 3.b of Slayton's CEC Agreement) or engaging in any conduct contrary to the provisions of Section 3.b of Slayton's CEC Agreement.

7. Allowing Slayton's name, reputation or likeness to be used in the marketing or sale of commercial landfill drilling services by a Competitor.

IT IS FURTHER ORDERED that, pursuant to Federal Rule of Civil Procedure 65(d)(2), this injunction is not only binding on Sean Slayton, but also on any "other persons who are in active concert or participation" with the named parties or their officers, agents, servants, employees, or attorneys, as long as those non-parties acting in active concert or participation receive actual notice of the injunction. Fed. R. Civ. P. 65(d)(2). As the Supreme Court has explained, "the purpose of this rule is to prevent defendants from 'nullify[ing] a decree by carrying out prohibited acts through aiders and abettors." K.C. ex. Rel. Africa H. v. Shipman, 716 F.3d 107, 115 (4th Cir. 2013) (quoting Regal Knitwear Co. v. NLRB, 324 U.S. 9, 14, 65 S. Ct. 478, 89 L.Ed. 661 (1945)). Accordingly, Slayton is required to provide a copy of this Order to his current employer, Landmarc, or any prospective employer until entry of a final judgment in this action. In furtherance of this provision, and in order to ensure compliance with this injunction, Slayton will be required to provide weekly reports to CEC, in the form of production records similar to those produced by his employer Landmarc in response to CEC's subpoena (See Motion for Prelim. Inj., Exh 4).

IT IS FURTHER ORDERED that this Order and Preliminary Injunction shall remain in effect until further order of this Court or a final determination of this matter after a hearing on the merits.

IT IS FURTHER ORDERED that, pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, CEC is required to post a bond in an amount and form to be determined and communicated by the Court. The amount of bond is within the Court's discretion. Pashby v. Delia, 709 F.3d 307, 332 (4th Cir. 2013). Trial in this matter is scheduled to take place in March 2018, at which time a jury will decide the merits of the parties' claims. Accordingly, the Court finds an appropriate bond should equal approximately six (6) months of Defendant's previous salary with Plaintiff CEC. Plaintiff CEC shall post a bond of $30,000 no more than seven calendar days from the date of this Order.

IT IS SO ORDERED.

Signed: September 21, 2017

Frank D. Whitney
Chief United States District Judge